**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Nnete Matima, | Case No.  1:25-cv-10213-PAE |
| Plaintiff, | **AMENDED COMPLAINT** |
| -against- | <u>JURY TRIAL DEMANDED</u> |
| ByteDance Inc, Allen Adjamian, and Ahmad Fayad, | |
| Defendants. | |

Plaintiff Nnete Matima, by and through her undersigned attorneys Valli Kane & Vagnini LLP, alleges as follows:

## <u>PRELIMINARY STATEMENT</u>

1.      Plaintiff Nnete Matima ("Ms. Matima" or "Plaintiff") brings this action against her former employer, ByteDance Inc. ("ByteDance"), Allen Adjamian, and Ahmad Fayad (collectively "Defendants") for sexual harassment, race discrimination, and retaliatory termination in violation of Federal, State and Municipal law.

2.      Defendants' treatment of Ms. Matima violates the New York State Human Rights Law, Executive Law §§ 209-301 *et seq*. ("NYSHRL") and the New York City Human Rights Law, codified as Title 8 of the Administrative Code of the City of New York, § 8-107 *et. seq*. ("NYCHRL").

3.      Plaintiff seeks damages for unlawful sexual harassment, race discrimination, and wrongful termination as set forth in more detail below.

## JURISDICTION AND VENUE

4.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is "complete diversity" of Plaintiff and Defendants, and the amount in controversy is in excess of $75,000.  As set forth in more detail in the "Parties" section below, Plaintiff is a Citizen of the State of New York, Defendant ByteDance is a Citizen of California, Defendant Chew is a Citizen of Singapore, Defendant Adjamian is a Citizen of California, and Defendant Fayad is a Citizen of California.

5.      Venue is appropriate within this judicial district under 28 U.S.C. § 1391 because, as set forth in the "Parties" section below, Defendant ByteDance resides within this judicial district.

6.      Additionally, a substantial part of the events or omissions giving rise to Plaintiffs claims occurred in this Judicial District, at Defendant ByteDance's offices located at 151 West 42nd Street, New York, NY 10036.  Defendant ByteDance owns, uses or possesses real property within the State of New York at that same address.

## PARTIES

7.      Plaintiff is currently a resident of Columbia County, New York.  During all relevant times related to the facts and legal claims set forth in this pleading, Plaintiff was a resident of New York County, New York.

8.      Defendant ByteDance is, upon information and belief, the parent company of TikTok Ltd. ("Tiktok"), a wholly owned subsidiary of ByteDance that is incorporated in the Cayman Islands.  ByteDance's principal place of business in the United States is in Culver City, California, and ByteDance maintains offices in New York City located at 151 West 42nd Street, New York, NY 10036.  ByteDance employs tens of thousands of people, with more than ten

thousand in the United States, and approximately one thousand of those employees work out of ByteDance's New York office.

9.      Defendant Allen Adjamian is a Citizen and resident of the State of California.  At all relevant times, he was Plaintiff's supervisor.

10.      Defendant Ahmad Fayad is a Citizen and resident of the State of California.  At all relevant times, he was Plaintiff's supervisor.

11.      Defendant Shew Zi Chew is a Citizen of Singapore and a resident of the State of California.  At all relevant times, he was the Chief Executive Officer of Defendant ByteDance.

## **FACTUAL ALLEGATIONS**

### I.      **Ms. Matima joins ByteDance as a Business Development (Sales) Representative**

12.      Plaintiff is a Black professional woman who has excelled in a variety of fields. She graduated from Fordham University (magna cum laude) with a major in legal and policy studies and graduated from the University of Massachusetts Law School.  After working as a lawyer, she focused her career on business development and sales.

13.      Defendant ByteDance is a private company, with no current public stock listing. It owns and operates both the popular social media platform TikTok, and the workplace communication software application Lark.  TikTok, created in China in 2016, quickly grew to become one of the most popular software applications on the internet, with more than a billion monthly active users, and this resulted in more than $80 billion dollars in sales revenue for ByteDance in 2022.  *See* Zheping Huang, *ByteDance Matches Tencent's $80 Billion Sales After TikTok Boom, https://www.bloomberg.com/news/articles/2023-04-03/bytedance-matches-tencent-s-80-billion-sales-after-tiktok-boom*  (accessed 01/11/2026).

14.      In July 2022, Ms. Matima was hired by Defendant ByteDance as a Business Development Representative ("BDR") in the company's "Lark" Division.

15. Lark is an enterprise collaboration and productivity platform that provides integrated tools for communication, document creation, task management, and other workplace functions within a single application. Its main competitors include Microsoft Teams, Google Workspace, Slack, Clickup, Monday.com, Asana and Notion.

16. As a BDR, Ms. Matima's role was to sell Lark to other businesses.

17. BDRs receive sales leads from the company, generate their own leads, and then contact those leads with the goal of converting those leads into closed sales.

## II. Sexual Harassment Allegations

18. Once she was hired by Defendant, Ms. Matima was subjected to a continuing pattern of sexual harassment that continued up until the termination of her employment by the Company.

*Defendant Allen Adjamian sexually harasses Ms. Matima*

19. On August 22, 2022, Ms. Matima was asked to go on her first off-site visit to Defendant's California headquarters, for the purpose of meeting Defendant's Vice President of Sales, Allen Adjamian ("Adjamian"), who was Ms. Matima's direct boss. That same day, Ms. Matima met Adjamian and the rest of the LA-based team.

20. Adjamian spent the whole day ogling Ms. Matima, who was wearing a dress, and he glared at her legs and backside. During lunch, when Ms. Matima returned from selecting her food, Adjamian waved Ms. Matima over to sit next to him at the lunch table. She did not want to do so, but felt required to sit with him because he was her boss.

21. As Ms. Matima began eating, Adjamian leaned in and whispered in her ear: "Do you always wear dresses?" He then said: "I bet your boyfriend likes you in dresses. Do you have one?" Ms. Matima did not respond, and fortunately another employee joined Adjamian and Ms. Matima at the table, interrupting the conversation.

22.     On August 23, 2023, Adjamian knocked on Ms. Matima's hotel room door at around midnight, local time.  Ms. Matima did not open the door, but heard Adjamian's voice in the hallway.

23.     Around 3:00am the same night, the front desk woke Ms. Matima up with a phone call.  The front desk told Ms. Matima that the hotel had received a complaint about loud music coming from Ms. Matima's room.  Ms. Matima told the front desk that they must have called the wrong room, because she had been sleeping, not making any noise.  The front desk did not indicate who made the complaint.

24.     On August 24, at around 11:00am, Adjamian stood over Ms. Matima as she sat at her work desk, leaned in, and said: "How did you sleep last night?  You should have let me in."

25.     Later, during the company's third quarter of 2022, Adjamian withheld Ms. Matima's rightfully earned bonus and commission pay.  When Ms. Matima inquired about the missing payments, Adjamian was completely uncooperative.  He refused to meet with Ms. Matima or to discuss how her commission was calculated, what the total amount was, and when Ms. Matima would be paid.

26.     During the company's fourth quarter of 2022, Adjamian called Ms. Matima on her personal phone to tell her that he had assigned her as the sole sales representative responsible for attending the Diversity, Equity and Inclusion ("DEI") in Technology Conference, and for engaging in email and LinkedIn outreach efforts to over 40 of the conference's speakers.  During the call, Ms. Matima asked Adjamian how spending all of this time away from closing sales leads would affect her sales quota and performance goals.  Adjamian said: "If you are worried about that, we can make other arrangements, like I do with the other girls.  Stop being such a prude! Can't you see, your life would be so much easier if you would give me what I want?"

27.    On November 28, 2022, Adjamian called Ms. Matima after work hours and said that he was aware that she had been approved for a transfer to another internal position, and he said that she had "better keep your performance up, and stop playing hard to get or else I will have to give you a bad report [to the next hiring manager]." At the time of this comment, Ms. Matima was regularly a top performing BDR in terms of daily sales metrics.

*Defendant Ahmad Retaliates against Ms. Matima*

28.    Defendant Ahmad Fayad replaced Defendant Adjamian as Ms. Matima's manager around the end of 2022. Upon information and belief, the two were friends, and Defendant Fayad knew about Adjamian's sexual harassment of Ms. Matima.

29.    In around mid-January or early February of 2023, Fayad told Ms. Matima that he knew she was seeking an internal transfer to a different role outside of the Lark division. Fayad told Ms. Matima that she was "about to run into a lot of headwinds and I will tell you when to transfer." He followed it up, while smirking, with the following comment: "Well? Have you heard back from any hiring managers? Is it even going anywhere? If a hiring manager contacted me, I wouldn't know what to tell them. I wouldn't tell them good things about you." Ms. Matima understood, from these comments, that Fayad was acting on behalf of Adjamian to prevent her from transferring out of the Lark division for refusing Adjamian's unwelcome sexual advances. Ms. Matima immediately complained to Human Resources ("HR") and, shortly thereafter, Fayad and Adjamian locked her out of all of Lark division's viewable meeting videos and minutes (i.e., the evidence of Ms. Matima's conversations with Fayad and Adjamian), and then spoliated them.

30.    On or about January 14, 2023, Fayad initiated a barrage of phone calls to Ms. Matima during a conference that she was attending, knowing full well that Ms. Matima was

6

speaking with customers all day.  When Ms. Matima asked him what he was calling for, Fayad was unable to provide any work-related reasons.  Fayad also continuously placed calls to Ms. Matima's co-workers to see where she was, and what she was doing, without having any work-related reason for doing so.  Fayad continued this inexplicable "stalking" behavior by asking that Ms. Matima connect with him via LinkedIn, a social media site, ostensibly for the purpose of sending her sales leads, and demanded that she "like" and "comment" on his LinkedIn posts. When Ms. Matima asked Fayad about the leads, he acted like he didn't remember discussing them.  Fayad never sent Ms. Matima any such leads.  Instead, he constantly demanded Ms. Matima's presence, after work hours.  Additionally, when Ms. Matima came to work on Monday mornings, Fayad would demand to know what she had been doing over the weekend and who she had been spending time with during her weekend, off duty hours.

31.     During the month of February 2023, Ms. Matima was conducting an internal search for positions within ByteDance that she could transfer to, in order to be away from Adjamian and Fayad.  From before the time when Fayad became Ms. Matima's supervisor, her internal approval to transfer had been approved, subject to identification of a matching internal position.  On or about February 21, 2023, Ms. Matima observed that in the morning, her internal approval status was fine, but that when she went to apply for an internal role, her transfer approval had suddenly and mysteriously been revoked.  Ms. Matima sought out Mr. Fayad to inquire about the status of her internal approval to transfer.  Fayad was aggressive, and falsely claimed that he was unaware that Ms. Matima was applying for internal transfers.  He stated definitively that he did not intend to approve of any transfer request made by Ms. Matima.

32.     On or about February 23, 2023, Ms. Matima submitted another ethics complaint expressing concern for her safety due to the ongoing sexual harassment and retaliation she was

experiencing from Defendant Adjamian and the retaliatory conduct of Defendant Fayad.   Ms. Matima requested that Human Resources or a third party intervene by being present during her one-on-one meetings with her supervisors, because she was fearful for her safety.  Human Resources ignored this complaint and, instead, Fayad canceled all future one-on-one meetings with Ms. Matima, deleted records of their communications, and locked Ms. Matima out of the system where those records were maintained.

33.     From December 2023 through June 2023, Defendant Fayad continued to harass Ms. Matima, demanding her personal phone number, and using it to call her frequently both during the daytime, and after work hours.  During this time interval, Ms. Matima was also the recipient of phone calls from a blocked telephone number, in which the caller did not speak but instead made heavy breathing and moaning noises.  As a result of receiving these calls, which Matima suspected were from Fayad, she changed her telephone number.

34.     During this period of continuing harassment and retaliation, Ms. Matima was fearful for her safety.  She was afraid to attend out of state and overnight work trips because of the conduct and unwanted sexual advances identified above.  She was fearful of being physically attacked in her hotel room.  And although, during this time, she blocked Defendant Adjamian from contacting her through LinkedIn and other social media, Adjamian would create new accounts and engage in surveillance of Ms. Matima's social media profiles.  She was terrified, and was deprived of peace of mind and sleep, which lead to sleep deprivation, mental and emotional distress, and anxiety to the point where she began to experience anxiety attacks on her way to work at the New York Office.

35.    Despite apparently ignoring Ms. Matima's ethics complaints, both Defendants Adjamian and Fayad were ultimately terminated from their employment by Defendant ByteDance.

## III.    Race Discrimination and Retaliation Allegations

36.    Several years prior to Ms. Matima's onboarding at ByteDance, Black content creators and their allies expressed concern that ByteDance's social media application, TikTok, wasn't treating Black creators equally, prompting TikTok to apologize and release a statement vowing "to work each and every day to create a supportive environment for the Black community and everyone across the world."  Vanessa Pappas, TikTok U.S. General Manager, A message to our black community (June 1, 2020), available at: https://newsroom.tiktok.com/a-message-to-our-black-community?lang=en  (accessed 01/11/2026) ("We acknowledge and apologize to our Black creators and community who have felt unsafe, unsupported, or suppressed.").  TikTok's apology promised that its teams were "working on ways to elevate and support Black voices and causes." *Id*.  Black employees like Ms. Matima who joined ByteDance in the subsequent years took this statement as a positive sign that ByteDance would actually value the diverse voices among its employees and would accept accountability for doing so. *See* https://newsroom.tiktok.com/one-year-later-our-commitment-to-diversity-and-inclusion?lang=en ("One year later: Our commitment to diversity and inclusion" (June 23, 2021) (accessed 01/11/2026) (describing how TikTok was proud to launch BLXCK, an Employee Resource Group, "to connect to connect and support the advancement of Black talent…).

37.    ByteDance does not publicly disclose the racial, ethnic, or gender demographics of its workforce in the United States.  However, based on Plaintiff's observations, it appears that ByteDance's workforce in the U.S. is far less racially diverse than the labor market from which it hires, especially concerning Black employees.  For most of her time on the Lark sales team, Ms.

9

Matima was the only Black BDR.  Similarly, another ByteDance employee, Joel Carter, was the only Black employee on ByteDance's North American Advertising Policy team, consisting of 12 employees, and the only Black employee on the Global Advertising Policy team, which had 85 employees.

### *Ms. Matima's Employment at ByteDance*

38.     Ms. Matima is a Black female professional who excelled in a broad variety of fields.  She graduated from Fordham University *magna cum laude* with a degree in legal and policy studies, and graduated from the University of Massachusetts Law School.  After working initially as an attorney, she pivoted her career to business development with an emphasis on sales, founding her own ethically-sourced jewelry company along the way.  And, while employed full-time in various corporate jobs, Ms. Matima has also been a professional actor and performing artist since 2017.

39.     On or about July 25, 2022, Ms. Matima was hired by ByteDance as a Business Development Representative ("BDR") in the Company's Lark Division.  Based upon Ms. Matima's extensive experience in sales and leadership, including previously serving as a director of sales, she should have been offered a higher-level role, such as a Director of Sales, rather than being offered the BDR position.

40.     In the BDR position, Ms. Matima's role was to sell Lark to other businesses, through outreach in response to sales leads provided by ByteDance, and through her own efforts to generate sales leads through her own independent prospecting activities.

### *Defendants commence their racially disparate treatment of Ms. Matima*

41.     From the time of Ms. Matima's hiring onward, she was treated differently (and worse) than her predominantly white BDR comparators.  For instance, instead of onboarding Ms.

10

Matima properly, she was immediately told to start her sales outreach efforts to potential corporate customers.  As a result, she was not provided with enough time to complete the Company's mandatory training modules, like her white colleagues, and was compelled to work on nights and weekends to complete her training  In contrast, Ms. Matima's white BDR peers were given ample time during their normal work hours to complete their training before they were required to start their own sales outreach efforts.

42.     Less than two weeks after starting as a BDR, on August 4, 2022, Ms. Matima received a letter from Defendant Adjamian, the Vice President of Sales at the Lark Division, that outlined the expected Objectives and Key Results ("OKR") that constituted the sales goals applicable to Ms. Matima and her teammates.  Defendant Adjamian allocated 75% of responsibility for the team's OKR sales goals to Ms. Matima, with the other three (non-Black) BDR teammates collectively responsible for only 25% of the total OKR sales goal.  Adding insult to injury, and further constraining her ability to book sales, Ms. Matima was required to spend time providing training to some of those colleagues who had started around the same time as her.

43.     During this time, Ms. Matima was the only Black BDR on the 40-person North America Sales Team (although ByteDance would eventually add another Black woman to the team), and Defendant Adjamian continued to treat her materially worse than her non-Black BDR peers, including by holding her responsible for a disproportionate share of her team's sales goals, and by treating her in a disrespectful and patronizing manner, on a regular basis, while not treating Ms. Matima's non-Black peers similarly.

44.    On August 11, 2022, a week after receiving the August 4, 2022 sales goal letter

from Defendant Adjamian, Ms. Matima filed a written internal complaint to ByteDance's Human

Resources Department.  In that complaint, Ms. Matima stated:

I am experiencing problems with my manager (Allen Adjamian, VP of Sales) and I've barely started here.  I am very troubled by the way I am being treated and spoken to.  I am being treated differently from my colleagues (and they have noticed as well).  The issues: I have not been allowed to complete my trainings while others have been given time to focus on that.  I am having to train the new hires when I myself have been deprived of training.  I am not given the same considerations as others.  I am having piles of tasks thrown at me with no instruction.  I am having unreasonable expectations placed on me that others are not.  I am being spoken to disrespectfully.  I am being treated like a second-class citizen and being patronized constantly and don't feel that is right or fair.  I want to speak up immediately because it has created a hostile work environment and it is escalating. I am afraid that if these things are not addressed promptly, it will ruin my experience with the organization.  I came here to learn, further my career, and produce great results- not to be treated like I'm lesser than.  I am shocked that Allen is treating me this way and I am very upset.  Again, I am shocked that he has chosen to take this negative approach with me as I am so new and have barely gotten my footing here.  I have already scheduled 2 meetings, with no training, no support.  It is clear that despite that, I am not appreciated and I fear I am being set up for failure instead of being treated with consideration and being empowered by Allen.  This is all very disappointing and stressful.

*Defendants retaliate against Ms. Matima because of her first complaint*

45.    In response to Ms. Matima's complaint, ByteDance's Ethics Office, which

handles race discrimination complaints, began the process of opening an investigation.  But in

the meantime, ByteDance's management tried to cover up for Mr. Adjamian's discriminatory

conduct by attempting to divert Ms. Matima's attention to various contemplated internal

transfers to a new position within ByteDance.

46.    For example, on August 25, 2022, Andy Wang, the General Manager of the Lark

Division, told Ms. Matima that Mr. Adjamian wanted to promote her to an Account Executive

position because of her "stellar performance as a producer" on the team.  Mr. Wang said that Mr.

Adjamian would draw up the paperwork for Ms. Matima to be promoted in the next month or so.

But that never happened and when word filtered down to Mr. Adjamian that Ms. Matima had

made an internal complaint, he refused to move forward with Mr. Wang's strategy of diverting Ms. Matima's complaint via a promotion. Upon information and belief, Mr. Wang never genuinely intended to promote Ms. Matima.

47.    On or about the end of August, 2022, Ms. Matima was told by Andy Wang, the General Manager of the Lark Division, that three internal departments had approached him about having Ms. Matima transfer to work for them, but he said that he had declined their invitation and, when pressed, he would not identify the departments that had expressed interest in Ms. Matima. This prevented her from identifying internal opportunities where she would not be subjected to discrimination or retaliation by Defendant Adjamian.

48.    On October 4, 2022, the Ethics Department closed its investigation, concluding that there had been no wrongdoing. When asked for an explanation, Ethics Department staffer Lacey Rainwater told Ms. Matima that the Ethics Department had spoken to her colleagues, who were asked whether they thought Ms. Matima had been discriminated against, and they had responded that it "can't be that bad, since Nnete is doing so well" in her work. Ms. Rainwater refused to provide Ms. Matima with a copy of the investigative report.

49.    Around the same time that the investigation concluded, Defendant ByteDance promoted Defendant Adjamian to the Global Head of Sales. So instead of holding him accountable, ByteDance rewarded Defendant Adjamian with a significant promotion and gave him even more power within the Company.

50.    Empowered by the promotion, Defendant Adjamian began engaging in retaliatory acts against Ms. Matima. For example, in late October 2022, Defendant Adjamian assigned Ms. Matima to be the sole BDR to attend a Diversity Equity and Inclusion in Technology conference, but he told her not to attempt to sell Lark software to any conference attendees and he also

13

required her to suspend all of her other sales activities for two weeks to focus on the conference. Defendant Adjamian's directives to Ms. Matima undermined her ability to meet her fourth quarter sales quota and, worse yet, Defendant Adjamian took Ms. Matima's list of leads that she had generated at the conference and he distributed them to the other (non-Black) BDRs, which increased their sales figures at her expense, despite the fact that she had cultivated those leads.

51.     Additionally, Defendant Adjamian reassigned hundreds of low quality leads, steering them to Ms. Matima, from a non-Black BDR named Kimberly Collantes, who was struggling to generate leads and close sales associated with those low quality leads. Defendant Adjamian knew that assigning so many poor sales leads to Ms. Matima would prevent her from reaching her sales quota. And in a call during November 2022, a non-Black BDR colleague, Kimberly Collantes, told Ms. Matima that she and Mr. Adjamian had agreed that her "junk leads" would be given to Ms. Matima to put Ms. Matima at a disadvantage.

52.     In mid-November 2022, Defendant Adjamian refused to provide Ms. Matima with the quarterly bonus that she had rightfully earned as a result of her sales results. Defendant Adjamian refused Ms. Matima's repeated requests for a meeting to discuss his failure to provide the bonus, refused to state when or if she would receive the bonus, or how it would be calculated. Ultimately, Defendant Adjamian withheld this bonus, and the next quarterly bonus that Ms. Matima rightfully earned, while continuing to provide Ms. Matima's non-Black BDR colleagues with the timely payment of bonuses that they had earned. Ms. Matima complained to Defendant Adjamian that he was unlawfully withholding her bonus and treating her differently because of her race. In response, Defendant Adjamian reported Ms. Matima to ByteDance's human resources "business partner" Bhawna Raina, to whom Defendant Adjamian falsely claimed that others on his team had complained about her.

14

53.     Despite Defendant Adjamian's attempts to hinder Ms. Matima's sales performance, Ms. Matima was regularly the top performing BDR on her team when measured in terms of daily output. And in late November, 2022, Defendant Adjamian acknowledged Ms. Matima's strong performance that he could no longer deny. Defendant Adjamian falsely stated to Ms. Matima that she had been approved to transfer to another department, but that she would need to keep up her performance or else he would give a bad report about her to the hiring manager. However, no such transfer materialized, and Ms. Matima remained under the supervision of Mr. Adjamian.

<em>Ms. Matima learns of Defendants' derogatory racial comments</em>

54.     On January 5, 2023, a ByteDance account executive named Hannah Wells called Ms. Matima and informed her that Defendant Adjamian, Defendant Fayad, and four of Ms. Matima's BRD colleagues, Dana Azadegan, Kimberly Collantes, Lisa Novichkova, and supervisor Ahmad Fayad had been routinely referring to Ms. Matima as "Black Snake" and that Defendant Adjamian had explained that "Black Snake" was the "spirit animal" that he associated with with Ms. Matima. Ms. Wells stated that she learned this while attending a team dinner during a conference at Las Vegas.

55.     The "Black Snake" appellation is not only obviously a racially derogatory term, but also suggests, by inference, that Ms. Matima has the negative qualities associated with a snake: deceit, untrustworthiness, and sneakiness. It further suggests that she engaged in snake-like disloyalty by filing an internal ethics complaint about Defendant Adjamian's racial bias against her. These connotations negatively influenced the perception of Ms. Matima's colleagues about her performance. For example, in early January 2023, one of ByteDance's

15

account executives, Manual Perez, told Ms. Matima's teammates at a dinner that "All the BDRs are great, except one [Ms. Matima], she's checked out."

56.    In addition, after Ms. Matima filed her charge with the Commission, she learned from Hannah Wells that Azadegan, Collantes, Fayad) used the word "nigger" to describe Ms. Matima and Ms. Wells.  Ms. Wells learned this from Ms. Novichkova, a BDR who was leaving the Company and who related to Ms. Wells that Azadegan was using that hateful term to refer to both Ms. Matima and Ms. Wells on a regular basis.

*Defendants continue to engage in retaliatory conduct*

57.    Later in January 2023, Ms. Matima came down with the flu and told Defendant Fayad that she could not attend an in-person meeting being held in San Jose, California, due to her illness.  Although Defendant Fayad personally approved Ms. Matima's request for sick leave, he pretended that she had not informed him that she would not attend the meeting.  Instead, he ordered her to fly to San Jose that same night, threatening to report Ms. Matima to Human Resources if she did not comply.  Ms. Matima was unable to follow Defendant Fayad's direction, due to illness, and instead attended the meeting virtually and actively participated in all group discussions, despite being ill.  Defendant Fayad did in fact report Ms. Matima to Human Resources.  As a result, Ms. Raina of Human Resources asked Ms. Matima why she had not attended the meeting in person, even though Ms. Raina knew that Ms. Matima had taken sick leave in the days leading up to and including the date of the meeting, and even though Ms. Raina attended the meeting and knew that Ms. Matima was there participating virtually.  Mr. Fayad did not impose similar demands on Ms. Matima's non-Black BDR colleagues, or report them to Human Resources when those non-Black BDR colleagues came down with legitimate illnesses, as he did with Ms. Matima.

16

58.    In another instance, Defendant Fayad berated Ms. Matima for missing work on a Friday in January 2023, even though Ms. Matima and two other salespeople had been told that they could take the day off.  And in late January 2023, Ms. Matima learned that Defendant Fayad had taken leads that Ms. Matima had substantially developed and gave them to a white BDR named Lisa Novichkova.  When Ms. Matima asked Ms. Novichkova about the leads, Ms. Matima was told that Defendant Fayad had promised Ms. Matima's leads to Ms. Novichkova.  Ms. Matima then asked Defendant Fayad about the leads, and he refused to transfer them back to Ms. Matima.  Moreover, Defendant Fayad and Defendant Adjamian told a teammate that Ms. Matima had "dropped the ball" by not contacting a potential client, for the purpose of smearing Ms. Matima's reputation among her colleagues.  That allegation was false.  In fact, Ms. Matima had contacted the client and Ms. Matima's work with that client instead led to one of the largest revenue-generating deals for the team.  Despite this success, Ms. Matima never received any recognition closing the deal.

59.    In January 2023, Defendants Adjimian and Fayad began excluding her from meetings.  She learned that there was a conference scheduled for New York City where every other member of her team had been invited except for her (including teammates who live in other cities).  She was the only person who was going to be excluded, until at the last minute, she received a request to attend.  Ms. Matima received a last minute invitation after BDR Alcaeus Wong was prohibited from attending.  Upon information and belief, this is because, a few days earlier, he made a derogatory racial comment about Hannah Wells' "blackness" while they were both attending the CES conference in Las Vegas, and because Ms. Wells reported Mr. Wong's conduct to human resources.

17

60. In late January 2023, Defendant Fayad told Ms. Matima that he was aware she wanted to transfer to a different department, but that he would not let her do so. He stated that Ms. Matima was "About to run into a lot of headwinds and I will tell you when I want you to transfer." Then, while smirking, he stated: "Well, have you heard back from any hiring managers? Is it even going anywhere?" Then, Fayad stated "if a hiring manager contacted me, I wouldn't know what to tell them. I wouldn't tell them good things about you." Ms. Matima inferred from these comments that Defendant Fayad was actively interfering in her attempt to transfer to other departments within ByteDance.

61. On February 9, 2023, Ms. Matima learned that the head of marketing, Katrina Krantz, had wanted to hire her and was told by Defendant Fayed, by Andy Wang, and by Ms. Raina that she (Ms. Krantz) would not be permitted to hire Ms. Matima, despite Ms. Matima's stellar qualifications for the role. And over the next two weeks, Defendant Fayad obstructed Ms. Matima's potential transfer to yet another department, first by delaying the submission of his approval of her transfer application, and later affirmatively stating that he would not approve the transfer request after all.

*Ms. Matima engages in additional protected activity*

62. On February 23, 2023, Ms. Matima filed a five-page internal complaint with ByteDance explaining that (1) her prior discrimination and hostile work environment complaints had been mishandled; (2) she had learned that Defendants Adjamian, Fayad, and others referred to her as "Black Snake"; (3) that Defendants Adjamian and Fayad had engaged in a pattern of retaliation against her for filing a prior complaint (and she provided supporting documents); (4) she had sought to transfer to a different department to avoid Defendants Adjamian and Fayad, but Defendant Fayad and others had blocked her transfer; and (5) that she continued to be treated

18

in a discriminatory, retaliatory, and unprofessional manner.  She concluded her internal

complaint by stating:

> At this point, because the hostility and retaliation are steadily escalating on a day to day basis, I do not at all feel safe.  I have experienced by direct leaders (Ahmad [Fayad], Allen [Adjamian]) smear my name, reputation and completely misrepresent facts and fabricate negative narratives regarding me.  I feel as if I am constantly walking on egg shells despite working very hard to advance Lark and continuing to be a high performing member of the team.  The aforementioned list of incidents outline continuing retaliation on the part of my direct leadership which ensued after my previous Good Faith Ethics Complaint.  I hope that this time around, my pleas for help will be taken seriously as a I really hope to finally experience a healthy work environment, most preferably on a team, in role which is commensurate with my education, skills, and experience, in which I can thrive or at least be treated with basic respect and consideration.

63.     This complaint led to another (inadequate) investigation from March 2023 to

early June 2023, with which Ms. Matima fully cooperated.  But in the meantime, Defendant

Fayad continued to engage in retaliatory conduct aimed at Ms. Matima.  For example, he

scheduled a recurring two-hour weekly calling block after work hours on the East coast, which

he knew would be burdensome for Ms. Matima to attend.  Defendant Fayad also told Ms.

Matima that she should take Paid Time Off if she did not want to join an evening meeting, and

then he told other teammates that Ms. Matima refused to join the meetings when she was unable

to join some of them.  And once again, Defendant Fayad told Ms. Matima to give some of her

leads to a white BDR colleague.

*Defendants retaliate against Ms. Matima because of her second complaint*

64.     On April 14, 2023, Mr. Wang demanded to know if Ms. Matima was going to sue

ByteDance, said that the Legal Department was ready for litigation, and noted that Defendant

Fayad had given Ms. Matima a negative performance evaluation.  Up until that time, Ms.

Matima received only positive performance feedback, including receiving an award for revenue

generation.  Mr. Wang also suggested that he would create a new role for Ms. Matima that

19

reported directly to him, but he did not follow through with transferring Ms. Matima into that role.

65.    On April 18, 2023, Ms. Matima received the negative performance review described by Mr. Wang, which was completed by Defendants Fayad and Adjamian.  The overall score was "Improvement Needed."  However, the review contained false and unfair criticisms that did not accurately reflect Ms. Matima's strong performance and did not give sufficient weight to the fact that Ms. Matima had attained 95% of the sales goals her supervisors had established for her despite their attempts to interfere with her performance by compelling her to distribute her leads to white BDR colleagues.  The evaluation was presented by Defendant Fayed, Mr. Wang, and Ms. Raina.  The negative review was the result of a material deviation, by ByteDance, from the normal review process.  Normally, that process involved employees selecting which other employees would be proving their performance feedback.  In Ms. Matima's case, she selected two colleagues who rated her performance as excellent.  However, in a departure from the Company's ordinary practice, Adjamian and Fayad then invited other colleagues to contribute to Ms. Matima's review for the purpose of lowering her overall performance appraisal.  When Ms. Matima made an objection to Mr. Wang concerning this departure from the Company's ordinary practice, Mr. Wang informed Ms. Matima that she could appeal the evaluation and that he could correct it to reflect her actual performance, but although she did appeal the review, Mr. Wang and Ms. Raina later informed Ms. Matima in late May 2023 that higher level leadership declined to approve any changes to the evaluation.

66.    The negative performance review was completely unjustified because Ms. Matima had met the 2022 4th Quarter and  2023 first quarter sales goals, a direct contradiction to the negative performance feedback included in her review.  The subjective portion of the review

was contributed coworkers who were invited by Fayad to contribute to Ms. Matima's review for the purpose of diminishing her rating, and those same coworkers, described above, who had been referring to Ms. Matima and Ms. Wells using the unambiguously racial epithet "nigger." Accordingly, the review was tainted with both racial and retaliatory animus and was contradicted by the available objective sales data.

67.     In mid-May, 2023, Ms. Matima learned that Mr. Adjamian had been terminated from his employment by ByteDance.  This caused her to hope that ByteDance might actually take corrective action in response to her complaints.  Unfortunately, that wasn't to occur, and in early June 2023, ByteDance's investigators Christy Barr and Chelsea Walker informed Ms. Matima that they were unable to substantiate her complaints.  This conclusion was not revised upon the termination by the Company of Defendant Fayad's employment a few days later.

68.     Upon the termination of Defendant Fayad, Mr. Wang sought to use the vacant position to further his goal of terminating Ms. Matima's employment without providing her with further support for her race discrimination and retaliation claims, which he had previously indicated in April that he anticipated litigating.  First, Mr. Wang sought to promote the only other Black employee on the sales team into Defendant Fayad's vacant role, but that employee declined to take the position despite Mr. Wang's pressure to accept.  Next, Mr. Wang promoted his own bi-racial secretary, Christina Bowllan, who self-identifies as a Black female, into the role.  Ms. Bowllan immediately reduced Ms. Matima's workload, and reassigned Ms. Matima's leads away to others.

*Ms. Matima submits her third (and final) internal complaint*

69.     On June 13, 2023, Ms. Matima sent a letter to Mr. Wang and other leaders, and to Human Resources, explaining that her civil rights had been violated due to discrimination and

21

retaliation, and opposing those practices. In response, Ms. Raina insulted Ms. Matima by stating that she (Ms. Matima) had failed to secure a new role, despite the fact that Ms. Raina had full knowledge of the fact that Defendants Adjimian and Fayad had sabotaged Ms. Matima's attempts to secure an internal transfer.

*ByteDance terminates Ms. Matima in response to her third internal complaint*

70.    On June 26, Ms. Matima was removed from her team's rotation for receiving new sales leads.

71.    On July 3, 2023, Ms. Matima was excluded from the BDR Dashboard, which was used to assign leads, and Ms. Matima's leads were reassigned. As a result, Ms. Matima was effectively deprived of all job duties and responsibility, as well as of any means to generate the sales necessary to achieve her quarterly sales goals.

72.    On August 11, 2023, Ms. Matima met with Mr. Wang and with Zoe Ma from Human Resources, who informed Ms. Matima that she was being terminated effective immediately.

73.    Mr. Wang and Ms. Ma articulated false and pretextual reasons for Ms. Matima's termination.

74.    Ms. Matima's termination took place less than two months after her June 13, 2023 internal complaint to Mr. Wang and other leaders, and to Human Resources, explaining that her civil rights had been violated due to discrimination and retaliation, and opposing those practices. And according to Mr. Fayad, the decision to terminate Ms. Matima was made earlier, less than *two weeks* after Ms. Matima's June 13, 2023 complaint. And shortly prior to Ms. Matima's termination, she contacted the Company's Chief Executive Officer, and made another internal complaint.

75.     Likewise, her negative performance evaluation was delivered on April 18, 2023 (and likely completed earlier), less than two months after Ms. Matima filed her internal complaint on February 23, 2023.  And after Ms. Matima's first complaint in August 2022 concerning Mr. Adjamian's sexual harassment, she began experiencing retaliatory acts from Mr. Adjamian and then Mr. Fayad that started within days and continued unabated for months.  The close temporal proximity between Ms. Matima's

## IV.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Gender Discrimination (Hostile Work Environment and Quid Pro Quo Sexual Harassment) in violation of the New York State Human Rights Law, Executive Law §§ 209-301 *et seq***

#### (Against Defendants Adjamian and ByteDance)

76.     Plaintiff hereby repeats and realleges each and every allegation in the proceeding paragraphs as if set forth fully herein.

77.     Defendant Adjamian's conduct constitutes disparate treatment gender discrimination in violation of the New York State Human Rights Law ("NYSHRL"), Executive Law §§ 209-301 *et seq*.

78.     Defendant Adjamian's unwelcome conduct of a sexual nature, including sexual advances, sexual comments, and the other conduct described above, including his attempts to gain access to her hotel room during business travel, created an intimidating, hostile, or offensive environment that affected the terms and conditions of Plaintiff's employment.

79.     Defendant Adjamian's conduct was because of Plaintiff's sex or gender.  Had Plaintiff not been female, Adjamian would not have engaged in such conduct.  And, upon

23

information and belief, Adjamian has not and did not engage in such conduct with male employees.

80.    Defendant Adjamian's conduct, described above, was offensive, intimidating, and created an oppressive atmosphere, interfering with Plaintiff's work performance and changing the terms of her employment, including her continued employment, and her prospects for promotion.

81.    Defendant Adjamian's conduct constitutes a "continuing violation" of the New York State Human Rights Law rather than a discrete violation of the law.

82.    Defendant Adjamian's implicit threats that Plaintiff would have difficulty meeting her performance goals, described above, constitutes an act of intimidation intended to coerce her into being receptive toward his unwelcome sexual advances.

83.    Defendant Adjamian's conduct also constitutes *quid pro quo* sexual harassment in violation of the New York State Human Rights Law, because he conditioned Ms. Matima's continued employment and compensation upon her engaging in a sexual relationship with him.  Defendant Adjamian's quid pro quo sexual overture threatened Plaintiff's continued employment, negatively impacted her ability to earn an income through commissions, and resulted in the restriction of Plaintiff's sales activities in connection with the DEI conference and reassignment of her sales leads, and culminated in a coercive demand for Plaintiff to enter into a sexual "arrangement" with Defendant Adjamian in return for him making her life so much easier if she gave him what he wanted.

84.    Defendant ByteDance is vicariously liable for Defendant Adjamian's conduct because, through Mr. Wang and Ms. Raina, Defendant ByteDance effectively condoned or

24

approved of Defendant Adjamian's conduct, and that conduct eventually lead to tangible adverse employment actions against Plaintiff, including the withholding of her bonus, the restriction of her ability to earn income through generating sales commissions both directly as an instruction from Defendant Adjamian, and indirectly through the reassignment of Plaintiff's leads, and the refusal to allow Plaintiff to transfer positions internally, which culminated in the termination of her employment.

85.     Plaintiff's First Cause of Action makes this entire case subject to the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), which became effective March 3, 2022.

86.     As a result, Plaintiff suffered lost wages, emotional distress, reputational harm, and other damages recoverable under the NYSHRL.

## SECOND CAUSE OF ACTION

**Gender Discrimination (Hostile Work Environment and Quid Pro Quo Sexual Harassment) in violation of the New York City Human Rights Law, codified as Title 8 of the Administrative Code of the City of New York, § 8-107 *et. seq*.**

**(Against Defendants Adjamian and ByteDance)**

87.     Plaintiff hereby repeats and realleges each and every allegation in the proceeding paragraphs as if set forth fully herein.

88.     Defendant Adjamian's conduct constitutes disparate treatment gender discrimination in violation of the New York City Human Rights Law ("NYCHRL"), codified as Title 8 of the Administrative Code of the City of New York, § 8-107 *et. seq*.

89.     Defendant Adjamian's conduct constitutes both hostile work environment sexual harassment and quid pro quo sexual harassment, as described in the First Cause of Action, above.

90.    Defendant Adjamian's conduct constitutes a "continuing violation" rather than a discrete act violation of the law.

91.    Defendant ByteDance is vicariously liable for Defendant Adjamian's conduct under the NYCHRL, which imposes strict liability upon employers for sexual harassment engaged in by supervisory employees, regardless of whether the employer has implemented policies, practices or procedures intended to prevent violations.

92.    Plaintiff's Second Cause of Action makes this entire case subject to the EFAA, which became effective March 3, 2022.

93.    As a result, Plaintiff suffered lost wages, emotional distress, reputational harm, and other damages recoverable under the NYCHRL.

## THIRD CAUSE OF ACTION
### Race Discrimination in Violation of NYSHRL
### (Against Defendants Fayad and ByteDance)

94.    Plaintiff hereby incorporates the allegations above.

95.    Plaintiff was and is a member of a protected class (Black).

96.    Plaintiff was qualified for her position, as demonstrated by the fact that Defendant ByteDance hired her, she received positive performance feedback, including a revenue generation award, and she achieved her sales quotas until her leads were reassigned or diverted to other team members.

97.    Plaintiff suffered adverse employment actions including reduced sales commissions, withheld quarterly sales bonuses, she was denied internal promotions and

transfers, her sales leads were reassigned and diverted to other team members, and she was ultimately terminated.

98.     The facts alleged above, including without limitation being called "Black Snake" by her supervisor Defendant Fayad, and her disparate treatment in the terms and conditions of her employment (including the reassignment and diversion of her sales leads to other (non-Black) coworkers, her being deprived of leads from the BDR dashboard that her other (non-Black) coworkers received, the deliberate provision of "junk leads" to Plaintiff and not to other (non-Black) coworkers, the assignment of a bi-racial (but purportedly Black) employee as a "Cat's Paw" to eliminate Plaintiff's job duties and responsibilities and consequently to deprive her of income earning opportunities and threatening her continued employment all raise the inference that Defendants' conduct was motivated by discriminatory racial animus.

99.     Defendant ByteDance is vicariously liable for the conduct of Defendant Fayad because, through Mr. Wang and Ms. Raina, among others, Defendant knew or should have known of the unlawful conduct and failed to take action to prevent it.

100.     As a result, Plaintiff suffered lost wages, emotional distress, reputational harm, and other damages recoverable under the NYSHRL.

## FOURTH CAUSE OF ACTION
### Race Discrimination in Violation of NYCHRL
### (Against Defendants Fayad and ByteDance)

101.     Plaintiff hereby incorporates the allegations above.

102.     Plaintiff was and is a member of a protected class (Black).

103.     Plaintiff was qualified for her position, as demonstrated by the fact that Defendant ByteDance hired her, she received positive performance feedback, including a revenue

27

generation award, and she achieved her sales quotas until her leads were reassigned or diverted to other team members.

104. Plaintiff suffered adverse employment actions including reduced sales commissions, withheld quarterly sales bonuses, she was denied internal promotions and transfers, her sales leads were reassigned and diverted to other team members, and she was ultimately terminated.

105. The facts alleged above, including without limitation being called "Black Snake" by her supervisor Defendant Fayad, and her disparate treatment in the terms and conditions of her employment (including the reassignment and diversion of her sales leads to other (non-Black) coworkers, her being deprived of leads from the BDR dashboard that her other (non-Black) coworkers received, the deliberate provision of "junk leads" to Plaintiff and not to other (non-Black) coworkers, the assignment of a bi-racial (but purportedly Black) employee as a "Cat's Paw" to eliminate Plaintiff's job duties and responsibilities and consequently to deprive her of income earning opportunities and threatening her continued employment all raise the inference that Defendants' conduct was motivated by discriminatory racial animus.

106. Defendant ByteDance is vicariously liable for Defendant Fayad's conduct under the NYCHRL, which imposes strict liability upon employers for race discrimination engaged in by supervisory employees, regardless of whether the employer has implemented policies, practices or procedures intended to prevent violations.

107. As a result, Plaintiff suffered lost wages, emotional distress, reputational harm, and other damages recoverable under the NYCHRL.

## FIFTH CAUSE OF ACTION

### Retaliation in Violation of NYSHRL

### (Against Defendants Fayad and ByteDance)

108.    Plaintiff reincorporates the allegations above.

109.    Plaintiff engaged in protected activity when she submitted each of her internal complaints, identified above, to Defendant ByteDance.

110.    After submitting her internal complaints, identified above, to Defendant ByteDance, Plaintiff suffered material adverse employment actions including, without limitation, reduced sales commissions, withheld quarterly sales bonuses, she was denied internal promotions and transfers, her sales leads were reassigned and diverted to other team members, and she was ultimately terminated.

111.    As set forth above, the retaliatory acts experienced by Plaintiff took place within close temporal proximity to her engaging in protected activity, raising the presumption that her termination was because of her engaging in that protected activity. This conclusion is buttressed by the fact that Defendant ByteDance articulated only pretextual reasons for Plaintiff's termination.

112.    Defendant ByteDance is vicariously liable for the conduct of Defendant Fayad because, through Mr. Wang and Ms. Raina, among others, Defendant knew or should have known of the unlawful conduct and failed to take action to prevent it.

113.    As a result, Plaintiff suffered lost wages, emotional distress, reputational harm, and other damages recoverable under the NYCHRL.

## SIXTH CAUSE OF ACTION

### Retaliation in Violation of NYCHRL

### (against Defendants Fayad and ByteDance)

114. Plaintiff reincorporates the allegations above.

115. Plaintiff engaged in protected activity when she submitted each of her internal complaints, identified above, to Defendant ByteDance.

116. After submitting her internal complaints, identified above, to Defendant ByteDance, Plaintiff suffered material adverse employment actions including, without limitation, reduced sales commissions, withheld quarterly sales bonuses, she was denied internal promotions and transfers, her sales leads were reassigned and diverted to other team members, and she was ultimately terminated.

117. As set forth above, the retaliatory acts experienced by Plaintiff took place within close temporal proximity to her engaging in protected activity, raising the presumption that her termination was because of her engaging in that protected activity. This conclusion is buttressed by the fact that Defendant ByteDance articulated only pretextual reasons for Plaintiff's termination.

118. Defendant ByteDance is vicariously liable for Defendant Fayad's conduct under the NYCHRL, which imposes strict liability upon employers for retaliation engaged in by supervisory employees, regardless of whether the employer has implemented policies, practices or procedures intended to prevent violations.

119. As a result, Plaintiff suffered lost wages, emotional distress, reputational harm, and other damages recoverable under the NYCHRL.

**SEVENTH CAUSE OF ACTION**

**Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964**

120.    Plaintiff reincorporates the allegations above.

121.    Plaintiff satisfies the administrative exhaustion requirements necessary to assert her Seventh Cause of Action.  On or about September 2023, Plaintiff filed an Administrative Charge with the United States Equal Employment Opportunity Commission ("EEOC") setting forth her allegations of Defendants' pattern and practice of race discrimination in employment.  On or about July 24, 2025, the EEOC issued a Notice of Right to Sue, and Plaintiff timely commenced this action by filing suit on or about October 10, 2025.

122.    Plaintiff was and is a member of a protected class (Black).

123.    Plaintiff was qualified for her position, as demonstrated by the fact that Defendant ByteDance hired her, she received positive performance feedback, including a revenue generation award, and she achieved her sales quotas until her leads were reassigned or diverted to other team members.

124.    Plaintiff suffered adverse employment actions including reduced sales commissions, withheld quarterly sales bonuses, she was denied internal promotions and transfers, her sales leads were reassigned and diverted to other team members, and she was ultimately terminated.

125.    The facts alleged above, including without limitation being called "Black Snake" by her supervisor Defendant Fayad, and her disparate treatment in the terms and conditions of her employment (including the reassignment and diversion of her sales leads to other (non-Black) coworkers, her being deprived of leads from the BDR dashboard that her other (non-

31

Black) coworkers received, the deliberate provision of "junk leads" to Plaintiff and not to other (non-Black) coworkers, the assignment of a bi-racial (but purportedly Black) employee as a "Cat's Paw" to eliminate Plaintiff's job duties and responsibilities and consequently to deprive her of income earning opportunities and threatening her continued employment all raise the inference that Defendants' conduct was motivated by discriminatory racial animus.

126.    Defendant ByteDance is vicariously liable for the conduct of Defendant Fayad because, through Mr. Wang and Ms. Raina, among others, Defendant knew or should have known of the unlawful conduct and failed to take action to prevent it.

127.    As a result, Plaintiff suffered lost wages, emotional distress, reputational harm, and other damages recoverable under Title VII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court grant the following relief:

a.    Plaintiff requests a trial by jury;

b.    An award to Plaintiff for her actual damages in an amount to be determined at trial for lost wages and benefits, health insurance premiums, and an award of back pay and front pay;

c.    An award to Plaintiff of compensatory damages in an amount to be determined at trial;

a.    An award of prejudgment and post judgment interest;

b.    An award of punitive damages to deter future conduct by Defendant, in an amount to be determined at trial;

c.    An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

d.    Such other and further relief as this Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.


Dated: January 14, 2026
      Garden City, New York

                                      */s/ Matthew L. Berman*
                                      Matthew L. Berman, Esq.
                                      VALLI KANE & VAGNINI LLP
                                      600 Old Country Road, Suite 519
                                      Garden City, New York 11530
                                      mberman@vkvlawyers.com
                                      Tel: 516-203-7180

                                      *Attorneys for Plaintiff*