UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NNETE MATIMA,

                                          Plaintiff,                          25 Civ. 10213 (PAE)
                          -v-
                                                                              ORDER
BYTEDANCE, INC. *et al.*,

                                          Defendants.

PAUL A. ENGELMAYER, District Judge:

This order addresses (1) the parties' recent correspondence concerning plaintiff Nnete

Matima's unauthorized *ex parte* letter to the Court, dated April 22, 2026 ("the letter"), *see, e.g.*,

Dkts. 32, 38–39, 43; and (2) the request by Matima's counsel to withdraw as her attorneys, *see*

Dkts. 40–42.

First, the Court denies defendants' request for access to the letter. Matima's letter

principally criticizes the conduct of her own lawyers, including by describing her ostensible

communications with them regarding this case. It thus contains privileged information. And

Matima's transmission of the letter to the Court *ex parte*—although unauthorized—did not waive

the privilege because Matima, in doing so, plainly did not intend for it to be disclosed to any

other party. *See, e.g.*, *New York v. Mayorkas*, No. 20 Civ. 1127, 2021 WL 2850631, at *6–7

(S.D.N.Y. July 8, 2021) (unsolicited, *ex parte* submission to the court of attorney-client

privileged information did not waive privilege); *see also United States v. Zolin*, 491 U.S. 554,

568–69 (1989) ("*in camera* review" of privilege materials is a "practice [] well established in the

federal courts" and "does not destroy the privileged nature of the contested communications"); *In*

*re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d 379, 386–87 (2d Cir. 2003) (same).

Second, the Court hereby suspends all litigation activity in this case, pending resolution of the motion to compel arbitration. After resolution of that motion, the Court will determine whether, and if so how, to resolve the motion to withdraw. For avoidance of doubt, Matima's current attorneys remain counsel of record for her in this matter, unless and until the Court orders otherwise.[1] The Court accordingly directs (1) Matima to cease sending email (or other) communications to the Court; and (2) Matima's counsel to serve this Order on Matima forthwith, and, by May 13, 2026, to file a declaration on the public docket confirming such service.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: May 11, 2026
       New York, New York

---

[1] On May 4 and 5, 2026, the Court received three emails from Matima, which attached, *inter alia*, a "Second Amended Complaint" and "Demand for Attorney Sanctions." These emails and attachments are appended to this order as Exhibits A–C. The Court hereby denies Matima's request for leave to file these materials, because they were not submitted by her attorneys, which, as noted, remain counsel of record. *See* Federal Rule of Civil Procedure 11(a) (requiring all pleadings and written motions to be signed by "at least one attorney of record" where the party submitting such is represented).

2

# Exhibit A

| | |
|---|---|
| **Subject:** | Plaintiff's Demand for Attorney Sanctions Filing: Matima v Bytedance, Inc. (d/b/a TikTok) Case No. 1:25-cv-10213-PAE |
| **Date:** | Monday, May 4, 2026 at 8:00:52 AM Eastern Daylight Time |
| **From:** | Nnete Matima |
| **To:** | Engelmayer NYSD Chambers |
| **CC:** | Nnete Matima |
| **Attachments:** | Demand for Atty Sanctions 05-04-26 (13).pdf, Cover Letter Demand for Atty Santions 05-04-26 (1).pdf |

CAUTION - EXTERNAL:


Dear Clerk of the Court:

I write to submit into the record, my Demand for Attorney Sanctions and accompanying Cover Letter.

It is my intention to copy all parties/ attorneys of record.

Kindly ensure that all parties are copied, as I inquire as to how I can gain access to the court's electronic filing system as a pro se.

Please forgive any short-comings in my filing as I am an unlicensed non practicing lawyer and have no experience with the practice of law.

Respectfully Submitted,

Nnete Matima, pro se

nnetematima@gmail.com <mailto:nnetematima@gmail.com>
Tel: 914-222-3834
CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

Nnete Matima, *pro se*
nnetematima@gmail.com
Tel: 914-222-3834

May 4th, 2026

Clerk of the Court
United States District Court
Southern District of New York
40 Foley Square, Room 2201
New York, NY 10007
212-805-0268

Re: Matima v Bytedance, Inc. (d/b/a TikTok)
Case No. 1:25-cv-10213-PAE
Demand for Attorney Sanctions

Dear Clerk of the Court:

Enclosed for filing, please find my Demand for Attorney Sanctions in the above-referenced matter.

This demand is filed in response to the fraudulent instruments which defense counsel submitted to the court in their filing dated 4/27/26.

Thank you for your assistance.

Sincerely,

___/s/ *Nnete Matima*_____,*pro se*

Nnete Matima

cc:

All parties of record (via email to Clerk of the Court)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NNETE MATIMA,

    Plaintiff,

        -against-

ByteDance Inc., Allen Adjamian,
and Ahmad Fayad,

    Defendants.

Case No. 1:25-cv-10213-PAE

**DEMAND FOR ATTORNEY
SANCTIONS**

### RE: FALSIFIED EVIDENCE SUBMITTED BY DEFENDANTS ADJAMIAN AND FAYAD'S COUNSEL, IN VIOLATION OF FEDERAL RULES OF CIVIL PROCEDURE 11,12; U.S.C§1001; CALIFORNIA PENAL CODE 134; ABA MODEL RULE 3.3

Clerk of the Court
United States District Court
Southern District of New York
40 Foley Square, Room 2201
New York, NY 10007
212-805-0268

May 4, 2026

Dear Clerk of the Court:

I hereby urgently wish to draw the court's attention to the unethical and criminal act of
<u>knowingly</u> submitting a false instrument (Exhibits C, G, H, I) by Ivan R. Novich, Esq. of Littler
Mendelsen, P.C.

I firmly believe that this false and forged instrument was provided to abovementioned counsel by
Greenberg Traurig who are the main custodians of Defendant Bytedance's evidence and also
represent Defendant Bytedance. Proof of this is evidenced by the fact that I recently observed
Ms. Demetra Makris, Esq., attorney of counsel for Greenberg Traurig, stalking my instagram

(social media) page for the purpose of intimidating me. The stalking was so incessant that I opted to block her instagram page (Exhibit E) and nip her obvious intimidation tactics in the bud.

I see that Ms. Makris unlawfully acquired my <u>trademarked</u> photo (Exhibit F) and misappropriated it, without my express written  consent,  to <u>knowingly</u> construct the false and fabricated instrument (Exhibits C& D) which Littler Mendelsen <u>knowingly</u> submitted to  this court on April 27, 2026, violating my rights as well as my registered trademark #86660218 (image and likeness), to buttress their phony motion of the same date. This forged instrument (Exhibit C) submitted by Littler Mendelsen directly shows the collaboration between Littler Mendelsen's counsel and Greenberg Traurig's counsel to undermine my rights.

For comparison's sake, I provide the court with the original and authentic screenshots thread which captures my communication with Shuqi Hu, Human Resources Business Partner. (Exhibits A&B) I also provide the court, my instagram page containing the picture (far left, second down) that was used to construct the fabricated instrument. (Exhibit F)

Moreover, if my attorneys, Valli Kane & Vagnini had exercised due diligence, they would have spotted, verified (with me) and raised the alarm to the court about  this fraudulent instrument.

This court should take a dim view and be outraged by this deliberate, intentional, reckless, outrageous and egregious violation of federal, state, and New York City laws. This is also a gross violation of my constitutional rights in this case.

## Discussion:

Presenting false evidence in federal court carries severe consequences ranging from case ending sanctions to permanent disbarment and criminal prosecution. As officers of the court, lawyers have a strict **duty of candor** to the tribunal which is the court that overrides their duty of client confidentiality (ABA Model Rule 3.3).

1. **Mandatory Remedial Measures**: If a lawyer discovers  they have offered false evidence, they **must** take remedial action, which may include disclosing the falsity to the judge even if it reveals a client's  secrets.

2. **Disciplinary Action**: Federal judges often refer such misconduct to the state bar association. This can result in:

- **Reprimand or Censure**: A public or private warning.
- **Suspension**: A temporary ban from practicing law.

- **Disbarment**: Permanent loss of license to practice.

**Under Federal Rule of Civil Procedure 11**, attorneys who sign and file documents, by their act, certify that the factual contentions have evidentiary support.

**Sanctions for the violation of Federal Rule of Civil Procedure 11 include:**

1. Monetary Fines: Penalties paid directly to the court.
2. Attorney Fees: An order to pay the opposing party's legal costs.
3. Case Dismissal: Striking the false evidence.
4. Contempt of Court: A judge may hold the attorney in contempt, potentially resulting in fines or jail time.

### Criminal and Civil Liability:

1. **Criminal Prosecution**: Attorneys can be charged under **18 U.S.C. § 1001** for making "materially false" statements in a federal judicial matter, punishable by up to **five years in prison**. They may also face charges for **obstruction of justice or subornation of perjury**.

2. **Civil Malpractice**: If the false evidence negatively impacts the client's case, the client may sue the attorney for professional negligence or malpractice.

### Special Case: AI- Generated Evidence

Recent rulings have warned that using AI- generated citations or "fake" case law or other instruments in filings is grounds for immediate sanctions and striking the  filing from the record. Lawyers are now held to an "ongoing obligation" of competence when using these tools.

### Demand for Sanctions

1. **Criminal Contempt of Court:**
   - The attorneys of record for Defendant Bytedance, Demetra Makris, Todd H. Grishon, and  Kevin W. Murray of Greenberg Traurig and Ivan Ross Novich of Littler Mendelsen attorney of record for Defendants Adjamian and Fayad have blatantly violated the law and my constitutional rights by submitting to this court, a false instrument, intended to influence the court's decision.

2. The attorneys above deliberately, intentionally, outrageously and egregiously committed criminal actions by submitting false instruments to the court.

3. My current attorneys, Valli Kane & Vagnini, failed to exercise due diligence by failing to notify the court of this false instrument (Exhibit C) that was filed. In the process, they exhibited a gross dereliction of duty and they are currently threatening to abandon my case at this late stage, without cause. My current attorneys refused to assist me in drafting my Second Amended Complaint pursuant to this court's order (Dkt #36) and also failed to present and verify with me the authenticity of the false instrument which was presented by opposing counsel, thereby violating our attorney-client relationship and obligations.

4. **<u>All</u> of the abovementioned attorneys are liable as they knew or should have reasonably known of the falseness of Ms. Zangara's (Bytedance Employee Relations Employee) "Sworn Declaration" as Ms. Zangara has a lengthy and pervasive sordid history of working in concert with other corrupt and depraved individuals to engage in unlawful cover ups of good faith complaints on behalf of her employer, Defendant Bytedance to destroy innocent people's lives and therefore has a propensity for untruthfulness and untrustworthiness . (See Plaintiff's Second Amended Complaint). Moreover, it is clear that all of these attorneys not only knew but conspired to defraud this court, break the law and violate every ethical canon that exists. I shudder to think of how many innocent people's lives have been shattered by this motley crew of inept thugs disguised as officers and keepers of the law.**

5. I hereby move this court to apply the appropriate laws and rules cited on the caption above to sanction and punish all these unethical attorneys to the full extension of the law, up to and including, disbarment, and criminal penalties pursuant to **18 U.S.C. § 1001** (up to five years in prison) and monetary sanctions pursuant to **Rule 11**.

6. **Federal Rule of Civil Procedure 12 precludes Defendants Adjamian and Fayad's counsel from filing any belated Answer to my Second Amended Complaint because of their criminal acts and violations of the law and my constitutional rights.**

7. **Lastly, I move this court to immediately award me any and all compensatory, monetary, and punitive damages as outlined in my Second Amended Complaint.**

Respectfully Submitted,

___/s/ *Nnete Matima*_____,*pro se*

Nnete Matima                                              cc: All parties of record (via email to Clerk)

# EXHIBIT A

# AUTHENTIC AND ORIGINAL (Full Thread)



# EXHIBIT B
# AUTHENTIC AND ORIGINAL (Full Thread)



# EXHIBIT C

# FAKE AND FORGED

## AMS-2022-000276-Initial Report to Sun



Shuqi Hu and Nnete Matima's chat history

Hi Shuqi: When you get a moment, I would like to discuss a very urgent matter with you.

Shuqi Hu · Aug 12 11:31

Hi Nnete

May I know what's going on?

Nnete Matima · Aug 12 11:47

Yes. Unfortunately, I am experiencing problems with my manager and I've barely just started here. I am very troubled by the way I am being treated and spoken to. I am being treated differently from my colleagues (and they have noticed as well). The issues: I have not been allowed to complete my trainings while others have been given time to focus on that. I am having to train the new hires when I myself have been deprived of training. I am not given the same considerations as others. I am having piles of takes thrown at me with no instruction. I am having unreasonable expectations placed on me that others are not. I am being spoken to disrespectfully. I am being treated like a second-class citizen and being patronized constantly and I don't feel that it is right or fair. I want to speak up immediately because it has created a hostile work environment and it is escalating. I am afraid that if these things are not addressed promptly, it will ruin my experience with the organization. I came here to learn, further my career, and produce great results– not to be treated like I lesser than. I am shocked that Allien is treating me this way and I am very upset. Again, I am shocked that he has chosen to take this negative approach with me as I am so new and have barely gotten my footing here.

I have already scheduled 2 meetings, with no training, no support. It is clear that despite that, I am not appreciated and I fear I am being set up for failure instead of being treated with consideration and being empowered by Allen. This is all very disappointing and stressful.

# EXHIBIT D

## Obvious Discrepancies in Defendant's Exhibit C

1. Authentic screenshots are crisp and clear;
2. Forged screenshots are extremely blurry and faded (see name stamps and timestamps);
3. Authentic screenshots thread is full and complete;
4. Forged screenshots thread is incomplete;
5. Authentic screenshots do not have red, yellow, green dots in the upper left hand corner;
6. Forged screenshots contain red, yellow, and green dots in the upper left hand corner;
7. Forged screenshots have **different time stamps** compared to authentic screenshots;
8. Forged screenshots show a different headshot for Nnete Matima (red background with short haircut);
9. Authentic screenshots show a completely different headshot for Nnete Matima (light background, long hair);
10. Authentic screenshots show markings of being taken by a cell phone (time they were taken, wifi/ network symbols and battery life indicator);
11. Authentic screenshot for August 12, 2022 timestamp is: 9:36am;
12. Forged screenshot for August 12, 2022 timestamp is: 6:36 ( no am/pm);
13. Forged screenshot is an obvious fake created with photoshop and/or AI Generated.

# EXHIBIT E



# EXHIBIT F



# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NNETE MATIMA,

          Plaintiff,

-against-

BYTEDANCE INC, ALLEN ADJAMIAN,
AND AHMAD FAYAD,

          Defendants.

Civil Case No. 1:25-cv-10213-PAE

**DECLARATION OF**
**ASHLEY ZANGARA**

I, ASHLEY ZANGARA, of full age, declare as follows:

1.    Since August of 2021, I have been employed by Defendant ByteDance Inc. ("BDI" or the "Company") and have worked in its Employee Relations ("ER") department. My current position is AMS employee and labor relations leader.

2.    Attached as **Exhibit A** is a true and accurate copy of the "internal complaint" referenced in paragraph 44 of Plaintiff Nnete Matima's ("Plaintiff") Amended Complaint.[1] This was shared with me in connection with my role at the Company, and I spoke with Plaintiff about it.

3.    Attached as **Exhibit B** is a true and accurate copy of the "ethics complaint" or "internal complaint" referenced in paragraphs 32 and 62 of the Amended Complaint.[2] This document was shared with me in connection with my job duties at BDI, which the ER team responded to and investigated with my oversight.

---

[1] *See* Dkt. 17. Exhibit A includes a label in the header, as it was labelled in the course of BDI's investigation.
[2] *See* Dkt. 17.

ACTIVE 722956895v1

# EXHIBIT H

4.      Attached as **Exhibit C** is a true and accurate copy of the "letter" that is referenced in paragraph 69 of the Amended Complaint.[3] This document was shared with me in connection with my position at BDI.

5.      In 2022, the Company's third quarter was July, August and September, and its fourth quarter was October, November and December.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 27 , 2026

ASHLEY ZANGARA

_____

[3] *See* Dkt. 17.

ACTIVE 722956895v1

# EXHIBIT I

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NNETE MATIMA,<br><br>                    Plaintiff,<br><br>    -against-<br><br>BYTEDANCE INC, ALLEN ADJAMIAN,<br>AND AHMAD FAYAD,<br><br>                    Defendants. | Civil Case No. 1:25-cv-10213-PAE<br><br>**CERTIFICATE OF SERVICE** |

I, Ivan R. Novich, hereby certify as follows:

1.      I am an attorney with the law firm Littler Mendelson, P.C., counsel for Defendant Allen Adjamian ("Defendant").  I am familiar with the facts set forth in this Certification.

2.      On April 27, 2026, I caused a copy of the following to be served via email:

(a)      Notice of Motion to Dismiss the First Amended Complaint, or In the Alternative, to Compel Arbitration and Stay the Action;

(b)      Memorandum of Law In Support of Defendant's Motion to Dismiss the First Amended Complaint, or In the Alternative, to Compel Arbitration and Stay the Action;

(c)      Declaration of Ashley Zangara with exhibits;

(d)      Proposed Order; and

(e)      This Certificate of Service, upon:

Matthew L. Berman, Esq.
Valli Kane & Vagnini LLP
600 Old Country Road, Suite 519
Garden City, New York 11530
mberman@vkvlawyers.com
Attorneys for Plaintiff

# EXHIBIT J

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 27, 2026            _/s/ Ivan R. Novich_
        Newark, New Jersey             Ivan R. Novich

# Exhibit B

| Subject: | Plaintiff's Second Amended Complaint Filing: Matima v Bytedance, Inc. (d/b/a TikTok) Case No. 1:25-cv-10213-PAE |
|---|---|
| Date: | Monday, May 4, 2026 at 9:56:49 AM Eastern Daylight Time |
| From: | Nnete Matima |
| To: | Engelmayer NYSD Chambers |
| CC: | Nnete Matima |
| Attachments: | ___Matima Second Amended Complaint 05-04-26.docx (11).pdf, Matima Cover Letter to Second Amended Complaint 05-04-26.pdf |

CAUTION - EXTERNAL:


Dear Clerk of the Court:

I write to submit into the record, my Second Amended Complaint and accompanying Cover Letter (attached), pursuant to Order (Dkt #36), as pro se, because my current attorneys of record have flatly refused to assist me upon my request- effectively leaving me in the lurch at such a critical time.

The also have refused to at least provide me a copy of my complaint in a version which I can edit or my case file index so that I can review all the work they have done on my case. It appears they have not kept a case file index at their office at all throughout the entire duration of our attorney/client relationship.

They have promised me that they will file the response due by tomorrow (May 5th) regarding defendants' request to unseal my letter. We shall see if they follow through.

It is my clear understanding that they are still my attorneys (of record) until such time as they are released by the Court. I have reminded them that the court's previous Order (Doc #28) makes that very clear.

Nonetheless, in order to ensure that I comply with all deadlines, I will proceed pro se, until such time that I am able to secure counsel. Upon which time, I will promptly notify the court.

It is my intention to copy all parties/ attorneys of record (on the attached Second Amended Complaint and Cover Letter). Kindly ensure that all parties are copied.

Please advise as to how I can officially access the Court's electronic filing system as a pro se filer.

Also, please advise as to procedures for Address Confidentiality Orders to prevent my home address from being printed on public papers as safety is an issue.

Please forgive any short-comings in my filing as I am an unlicensed non practicing lawyer and have no experience with the practice of law. Thank you.

Respectfully Submitted,

Nnete Matima, pro se
nnetematima@gmail.com <mailto:nnetematima@gmail.com>
Tel: 914-222-3834
CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

Nnete Matima, *pro se*
nnetematima@gmail.com
Tel: 914-222-3834

May 4th, 2026

Clerk of the Court
United States District Court
Southern District of New York
40 Foley Square, Room 2201
New York, NY 10007
212-805-0268

Re: Matima v Bytedance, Inc. (d/b/a TikTok)
Case No. 1:25-cv-10213-PAE
Second Amended Complaint

Dear Clerk of the Court:


Enclosed for filing, please find the Second Amended Complaint in the above-referenced matter.

This amended complaint is filed in response to the Court's Order (Dkt #36) pursuant to Federal
Rule of  Civil Procedure 15(a)(1)(B).

Thank you for your assistance.

Sincerely,

   /s/ *Nnete Matima*            ,*pro se*

Nnete Matima




cc:

All parties of record (via email to Clerk of the Court)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NNETE MATIMA,

     Plaintiff,

          -against-

ByteDance Inc., Allen Adjamian,
and Ahmad Fayad,

     Defendants.

Case No. 1:25-cv-10213-PAE

**SECOND AMENDED COMPLAINT**

<u>JURY TRIAL DEMANDED</u>

     I, Nnete Matima, the Plaintiff in this matter, hereby file this second amendment pro se, after my case was abandoned by my current attorneys (of record) Valli Kane & Vagnini LLP. My complaint alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

1. Plaintiff Nnete Matima ("Ms. Matima" or "Plaintiff") brings this action against her former employer, ByteDance Inc. ("ByteDance"), Allen Adjamian, and Ahmad Fayad (collectively "Defendants") for sexual harassment, race discrimination, and retaliatory termination in violation of Federal, State and Municipal law.

2. Defendants' treatment of Ms. Matima violates the New York State Human Rights Law, Executive Law §§ 209-301 *et seq*. ("NYSHRL") and the New York City Human Rights Law, codified as Title 8 of the Administrative Code of the City of New York, § 8-107 *et. seq*. ("NYCHRL").

3. Plaintiff seeks damages for unlawful sexual harassment, race discrimination, unlawful retaliation, and wrongful termination as set forth in more detail below.

## JURISDICTION AND VENUE

4.  This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is "complete diversity" of Plaintiff and Defendants, and the amount in controversy is in excess of $75,000.  As set forth in more detail in the "Parties" section below, Plaintiff is a Citizen of the State of New York, Defendant ByteDance is a Citizen of California, Defendant Chew is a Citizen of Singapore, Defendant Adjamian is a Citizen of California, and Defendant Fayad is a Citizen of California.

5.  Venue is appropriate within this judicial district under 28 U.S.C. § 1391 because, as set forth in the "Parties" section below, Defendant ByteDance resides within this judicial district.

6.  Additionally, a substantial part of the events or omissions giving rise to Plaintiffs claims occurred in this Judicial District, at Defendant ByteDance's offices located at 151 West 42nd Street, New York, NY 10036.  Defendant ByteDance owns, uses or possesses real property within the State of New York at that same address.

## PARTIES

7.  Plaintiff is currently a resident of Columbia County, New York.  During all relevant times related to the facts and legal claims set forth in this pleading, Plaintiff was a resident of New York County, New York.

8.  Defendant ByteDance is, upon information and belief, the parent company of TikTok Ltd. ("Tiktok"), a wholly owned subsidiary of ByteDance that is incorporated in the Cayman Islands.  ByteDance's principal place of business in the United States is in Culver City, California, and ByteDance maintains offices in New York City located at 151 West 42nd

2

Street, New York, NY 10036. ByteDance employs tens of thousands of people, with more than ten thousand in the United States, and approximately one thousand of those employees work out of ByteDance's New York office.

9. Defendant Allen Adjamian is a Citizen and resident of the State of California. At all relevant times, he was Plaintiff's supervisor.

10. Defendant Ahmad Fayad is a Citizen and resident of the State of California. At all relevant times, he was Plaintiff's supervisor.

**FACTUAL ALLEGATIONS**

**I.    Ms. Matima joins ByteDance as a Business Development (Sales) Representative**

11. Plaintiff is a Black professional woman who has excelled in a variety of fields. She graduated from Fordham University (magna cum laude) with a major in legal and policy studies and graduated from the University of Massachusetts Law School. She has, however, focused her career on business development and sales, instead of practicing law.

12. Defendant ByteDance is a private company, with no current public stock listing. It owns and operates both the popular social media platform TikTok, and the workplace communication software application Lark. TikTok, created in China in 2016, quickly grew to become one of the most popular software applications on the internet, with more than a billion monthly active users, and this resulted in more than $80 billion dollars in sales revenue for ByteDance in 2022. *See* Zheping Huang, *ByteDance Matches Tencent's $80 Billion Sales After TikTok Boom,*

*https://www.bloomberg.com/news/articles/2023-04-03/bytedance-matches-tencent-s-80-billion-sales-after-tiktok-boom* (accessed 01/11/2026).

13. In July 2022, Ms. Matima was hired by Defendant ByteDance as a Business Development Representative ("BDR") in the company's "Lark" Division.

3

14. Lark is an enterprise collaboration and productivity platform that provides integrated tools for communication, document creation, task management, and other workplace functions within a single application.  Its main competitors include Microsoft Teams, Google Workspace, Slack, Clickup, Monday.com, Asana and Notion.

15. As a BDR, Ms. Matima's role was to sell Lark to other businesses.

16. BDRs receive sales leads from the company, generate their own leads, and then contact those leads with the goal of converting those leads into closed sales.

**II.     Sexual Harassment Allegations**

17. Once she was hired by Defendant, Ms. Matima was subjected to a continuing pattern of sexual harassment that continued up until the termination of her employment by the Company.

*Defendant Allen Adjamian sexually harasses Ms. Matima*

18. On August 22, 2022, Ms. Matima was asked to go on her first off-site visit to Defendant's California headquarters, for the purpose of meeting Defendant's Vice President of Sales, Allen Adjamian ("Adjamian"), who was Ms. Matima's direct boss.  That same day, Ms. Matima met Adjamian and the rest of the LA-based team.

19. Adjamian spent the whole day ogling Ms. Matima, who was wearing a dress, and he glared at her legs and backside.  During lunch, when Ms. Matima returned from selecting her food, Adjamian waved Ms. Matima over to sit next to him at the lunch table.  She did not want to do so, but felt required to sit with him because he was her boss.

20. As Ms. Matima began eating, Adjamian leaned in and whispered in her ear: "Do you always wear dresses?"  He then said: "I bet your boyfriend likes you in dresses.  Do you have one?"  Ms. Matima did not respond, and fortunately another employee joined Adjamian and Ms. Matima at the table, interrupting the conversation.

4

21. Ms. Matima immediately reported Mr. Adjamian's unwanted advances and sexual harassment to Lacey Rainwater, an attorney and investigator for the Ethics Department, in person. Ms. Rainwater assured Ms. Matima that she will add this complaint to her already existing active investigation and that she will "be in touch soon". However, Ms. Rainwater never followed up on Ms. Matima's sexual harassment complaint.

22. On August 23, 2022, Adjamian knocked on Ms. Matima's hotel room door at around midnight, local time.  Ms. Matima did not open the door, but heard Adjamian's voice in the hallway.

23. Around 3:00am the same night, the front desk woke Ms. Matima up with a phone call. The front desk told Ms. Matima that the hotel had received a complaint about loud music coming from Ms. Matima's room.  Ms. Matima told the front desk that they must have called the wrong room, because she had been sleeping, not making any noise.  The front desk did not indicate who made the complaint.

24. On August 24, 2022, at around 11:00am, Adjamian stood over Ms. Matima as she sat at her work desk, leaned in, and said: "How did you sleep last night?  You should have let me in."

25. On August 25, 2022, Ms. Matima reports continuing sexual harassment, discrimination and retaliation to Bhwana Raina, Human Resources Business Partner (who is fully aware that there is already an ongoing active Ethics investigation) while both were in attendance at a team dinner. After Ms. Matima reports the latest incidents of continuing sexual harassment and details the harrowing events which took place since arriving in L.A., Ms. Raina flatly remarked: "You will be ok."

5

26. Later, during the company's third quarter of 2022, Adjamian withheld Ms. Matima's rightfully earned bonus and commission pay.  When Ms. Matima inquired about the missing payments, Adjamian was completely uncooperative.  He refused to meet with Ms. Matima or to discuss how her commission was calculated, what the total amount was, and when Ms. Matima would be paid.

27. During the company's fourth quarter of 2022, Adjamian called Ms. Matima on her personal phone to tell her that he had assigned her as the sole sales representative responsible for attending the Diversity, Equity and Inclusion ("DEI") in Technology Conference, and for engaging in email and LinkedIn outreach efforts to over 40 of the conference's speakers.  During the call, Ms. Matima asked Adjamian how spending all of this time away from closing sales leads would affect her sales quota and performance goals.  Adjamian said: "If you are worried about that, we can make other arrangements, like I do with the other girls.  Stop being such a prude! Can't you see, your life would be so much easier if you would give me what I want?"

28. On November 28, 2022, Adjamian called Ms. Matima after work hours and said that he was aware that she had been approved for a transfer to another internal position, and he said that she had "better keep your performance up, and stop playing hard to get or else I will have to give you a bad report [to the next hiring manager]."  At the time of this comment, Ms. Matima was regularly a top performing BDR in terms of daily sales metrics.

6

*Defendant Fayad Retaliates against Ms. Matima*

29. Defendant Ahmad Fayad replaced Defendant Adjamian as Ms. Matima's manager around the end of 2022. Upon information and belief, the two were friends, and Defendant Fayad knew about Adjamian's sexual harassment of Ms. Matima.

30. On or about late December 2023, Fayad told Ms. Matima that he knew she was seeking an internal transfer to a different role outside of the Lark division. Fayad told Ms. Matima that she was "about to run into a lot of headwinds and I will tell you when to transfer." He followed it up, while smirking, with the following comment: "Well? Have you heard back from any hiring managers? Is it even going anywhere? If a hiring manager contacted me, I wouldn't know what to tell them. I wouldn't tell them good things about you." Ms. Matima understood, from these comments, that Fayad was acting on behalf of Adjamian to prevent her from transferring out of the Lark division for refusing Adjamian's unwelcome sexual advances. **Ms. Matima immediately complained to Bhawna Raina in Human Resources ("HR") in tears and, shortly thereafter, Fayad and Adjamian locked her out of all of Lark division's viewable meeting videos and minutes (i.e., the evidence of Ms. Matima's conversations with Fayad and Adjamian), and then spoliated them**.





31. On or about January 14, 2023, Fayad initiated a barrage of phone calls to Ms. Matima during a conference that she was attending, knowing full well that Ms. Matima was speaking with customers all day. When Ms. Matima asked him what he was calling for, Fayad was unable to provide any work-related reasons. Fayad also continuously placed calls to Ms. Matima's co-workers to see where she was, and what she was doing, without having any work-related reason for doing so. Fayad continued this inexplicable "stalking" behavior by asking that Ms. Matima connect with him via LinkedIn, a social

8

media site, ostensibly for the purpose of sending her sales leads, and demanded that she "like" and "comment" on his LinkedIn posts. When Ms. Matima asked Fayad about the leads, he acted like he didn't remember discussing them. Fayad never sent Ms. Matima any such leads. Instead, he constantly demanded Ms. Matima's presence, after work hours. Additionally, when Ms. Matima came to work on Monday mornings, Fayad would demand to know what she had been doing over the weekend and who she had been spending time with during her weekend, off duty hours.

32. During the month of February 2023, Ms. Matima was conducting an internal search for positions within ByteDance that she could transfer to, in order to be away from Adjamian and Fayad. From before the time when Fayad became Ms. Matima's supervisor, her internal approval to transfer had been approved, subject to identification of a matching internal position. On or about February 21, 2023, Ms. Matima observed that in the morning, her internal approval status was fine, but that when she went to apply for an internal role, her transfer approval had suddenly and mysteriously been revoked. Ms. Matima sought out Mr. Fayad to inquire about the status of her internal approval to transfer. Fayad was aggressive, and falsely claimed that he was unaware that Ms. Matima was applying for internal transfers. He stated definitively that he did not intend to approve of any transfer request made by Ms. Matima.

33. On or about February 23, 2023, Ms. Matima submitted another ethics complaint expressing concern for her safety due to the ongoing sexual harassment and retaliation she was experiencing from Defendant Adjamian and the retaliatory conduct of Defendant Fayad. Ms. Matima requested that Human Resources or a third party intervene by being present during her one-on-one meetings with her supervisors, because she was fearful for

9

her safety and did not want to be left alone with Fayad due to ongoing sexual harassment, stalking and his constant use of intimidation tactics. Human Resources ignored this complaint and, instead, Fayad canceled all future one-on-one meetings with Ms. Matima, deleted records of their communications, and locked Ms. Matima out of the system where those records were maintained.

34. From December 2023 through June 2023, Defendant Fayad continued to harass Ms. Matima, demanding her personal phone number, and using it to call her frequently both during the daytime, and after work hours. During this time interval, Ms. Matima was also the recipient of phone calls from a blocked telephone number, in which the caller did not speak but instead made heavy breathing and moaning noises. As a result of receiving these calls, which Matima suspected were from Fayad, she changed her telephone number.

35. During this period of continuing harassment and retaliation, Ms. Matima was extremely fearful for her safety. She was afraid to attend out of state and overnight work trips because of the conduct and unwanted sexual advances identified above. She was fearful of being physically attacked in her hotel room. And although, during this time, she blocked Defendant Adjamian from contacting her through LinkedIn and other social media, Adjamian would create new accounts and engage in surveillance of Ms. Matima's social media profiles. She was terrified, and was deprived of peace of mind and sleep, which led to sleep deprivation, mental and emotional distress, and anxiety to the point where she began to experience anxiety attacks on her way to work at the New York Office.

10

36. Despite apparently ignoring Ms. Matima's ethics complaints, both Defendants Adjamian and Fayad were ultimately terminated from their employment by Defendant ByteDance.

**III.    Race Discrimination and Retaliation Allegations**

37. Several years prior to Ms. Matima's onboarding at ByteDance, Black content creators and their allies expressed concern that ByteDance's social media application, TikTok, wasn't treating Black creators equally, prompting TikTok to apologize and release a statement vowing "to work each and every day to create a supportive environment for the Black community and everyone across the world."  Vanessa Pappas, TikTok U.S. General Manager, A message to our black community (June 1, 2020), available at:

https://newsroom.tiktok.com/a-message-to-our-black-community?lang=en (accessed 01/11/2026) ("We acknowledge and apologize to our Black creators and community who have felt unsafe, unsupported, or suppressed.").  TikTok's apology promised that its teams were "working on ways to elevate and support Black voices and causes." *Id*. Black employees like Ms. Matima who joined ByteDance in the subsequent years took this statement as a positive sign that ByteDance would actually value the diverse voices among its employees and would accept accountability for doing so.  *See*

https://newsroom.tiktok.com/one-year-later-our-commitment-to-diversity-and-inclusion?lang=en ("One year later: Our commitment to diversity and inclusion" (June 23, 2021) (accessed 01/11/2026) (describing how TikTok was proud to launch BLXCK, an Employee Resource Group, "to connect and support the advancement of Black talent…).

38. ByteDance does not publicly disclose the racial, ethnic, or gender demographics of its workforce in the United States.  However, based on Plaintiff's observations, it appears that ByteDance's workforce in the U.S. is far less racially diverse than the labor market from which it hires, especially concerning Black employees.  For most of her time on the

11

Lark sales team, Ms. Matima was the only Black BDR.  Similarly, another ByteDance employee, Joel Carter, was the only Black employee on ByteDance's North American Advertising Policy team, consisting of 12 employees, and the only Black employee on the Global Advertising Policy team, which had 85 employees.

*Ms. Matima's Employment at ByteDance*

39. Ms. Matima is a Black female professional who excelled in a broad variety of fields.  She graduated from Fordham University *magna cum laude* with a degree in legal and policy studies, and graduated from the University of Massachusetts Law School.  After graduating from Law School, she did not practice law but instead, focused her career on business development with an emphasis on sales, founding her own ethically-sourced jewelry company along the way.  While employed full-time in various corporate jobs, Ms. Matima has also been a professional actor and performing artist for many years.

40. On or about July 25, 2022, Ms. Matima was hired by ByteDance as a Business Development Representative ("BDR") in the Company's Lark Division.  Based upon Ms. Matima's extensive experience in sales and leadership, including previously serving as a director of sales, she should have been offered a higher-level role, such as a Director of Sales, rather than being offered the BDR position.

41. In the BDR position, Ms. Matima's role was to sell Lark to other businesses, through outreach in response to sales leads provided by ByteDance, and through her own efforts to generate sales leads through her own independent prospecting activities.

*Defendants commence their racially disparate treatment of Ms. Matima*

42. From the time of Ms. Matima's hiring onward, she was treated differently (and worse) than her predominantly white BDR comparators.  For instance, instead of onboarding Ms.

Matima properly, she was immediately told to start her sales outreach efforts to potential

corporate customers.  As a result, she was not provided with enough time to complete the

Company's mandatory training modules, like her white colleagues, and was compelled to

work on nights and weekends to complete her training  In contrast, Ms. Matima's white

BDR peers were given ample time during their normal work hours to complete their

training before they were required to start their own sales outreach efforts.

  

43. Less than two weeks after starting as a BDR, on August 4, 2022, Ms. Matima received a

letter from Defendant Adjamian, the Vice President of Sales at the Lark Division, that

outlined the expected Objectives and Key Results ("OKR") that constituted the sales

goals applicable to Ms. Matima and her teammates.  Defendant Adjamian allocated 75%

of responsibility for the team's OKR sales goals to Ms. Matima, with the other three

(non-Black) BDR teammates collectively responsible for only 25% of the total OKR

sales goal.  Adding insult to injury, and further constraining her ability to book sales, Ms.

13

Matima was required to spend time providing training to some of those colleagues who had started around the same time as her.



44. During this time, Ms. Matima was the only Black BDR on the 40-person North America Sales Team (although ByteDance would eventually add another Black woman to the team), and Defendant Adjamian continued to treat her materially worse than her non-Black BDR peers, including by holding her responsible for a disproportionate share of her team's sales goals, and by treating her in a disrespectful and patronizing manner, on a regular basis, while not treating Ms. Matima's non-Black peers similarly.

45. On August 11, 2022, a week after receiving the August 4, 2022 sales goal letter from Defendant Adjamian, Ms. Matima filed a written internal complaint to Shuqi Hu from ByteDance's Human Resources Department.  In that complaint, Ms. Matima stated:

I am experiencing problems with my manager (Allen Adjamian, VP of Sales) and I've barely started here.  I am very troubled by the way I am being treated and spoken to.  I am being treated differently from my colleagues (and they have noticed as well).  The

14

issues: I have not been allowed to complete my trainings while others have been given time to focus on that.  I am having to train the new hires when I myself have been deprived of training.  I am not given the same considerations as others.  I am having piles of tasks thrown at me with no instruction.  I am having unreasonable expectations placed on me that others are not.  I am being spoken to disrespectfully.  I am being treated like a second-class citizen and being patronized constantly and don't feel that is right or fair.  I want to speak up immediately because it has created a hostile work environment and it is escalating.  I am afraid that if these things are not addressed promptly, it will ruin my experience with the organization.  I came here to learn, further my career, and produce great results- not to be treated like I'm lesser than.  I am shocked that Allen is treating me this way and I am very upset.  Again, I am shocked that he has chosen to take this negative approach with me as I am so new and have barely gotten my footing here.  I have already scheduled 2 meetings, with no training, no support.  It is clear that despite that, I am not appreciated and I fear I am being set up for failure instead of being treated with consideration and being empowered by Allen.  This is all very disappointing and stressful.



15



<u>*Defendants retaliate against Ms. Matima because of her first complaint*</u>

46. In response to Ms. Matima's complaint, ByteDance's Ethics Office, which handles race discrimination complaints, began the process of opening an investigation. But in the meantime, ByteDance's management tried to cover up for Mr. Adjamian's discriminatory conduct by attempting to divert Ms. Matima's attention to various contemplated internal transfers to a new position within ByteDance.

47. For example, on August 25, 2022, Andy Wang, the General Manager of the Lark Division, told Ms. Matima that Mr. Adjamian wanted to promote her to an Account Executive position because of her "stellar performance as a producer" on the team. Mr. Wang said that Mr. Adjamian would draw up the paperwork for Ms. Matima to be

16

promoted in the next month or so.  But that never happened and when word filtered down to Mr. Adjamian that Ms. Matima had made an internal complaint, he refused to move forward with Mr. Wang's strategy of diverting Ms. Matima's complaint via a promotion. Upon information and belief, Mr. Wang never actually intended to promote Ms. Matima.

48. On or about the end of August, 2022, Ms. Matima was told by Andy Wang, the General Manager of the Lark Division, that three internal departments had approached him about having Ms. Matima transfer to work for them, but he said that he had declined their invitation  "on your (Ms. Matima's) behalf" and, when pressed, he would not identify the departments that had expressed interest in Ms. Matima.  This prevented her from identifying internal opportunities where she would not be subjected to discrimination or retaliation by Defendant Adjamian.



49. On October 4, 2022, the Ethics Department closed its investigation, concluding that there had been no wrongdoing. After investigating themselves, Lacey Rainwater, an attorney and investigator for the Ethics Department, informed Ms. Matima (in a documented

meeting) that her "complaints against Mr. Adjamian for gender discrimination (sexual harassment), race discriminaton, and national origin discrimination and retaliation, could not be substantiated." When asked for an explanation, Ms. Rainwater told Ms. Matima that the Ethics Department had spoken to her colleagues, who were asked whether they thought Ms. Matima had been discriminated against, and they had responded that it "can't be that bad, since Nnete is doing so well" in her work.  Ms. Rainwater refused to provide Ms. Matima with a copy of the investigative report.

50. Around the same time that the investigation concluded, Defendant ByteDance promoted Defendant Adjamian to the Global Head of Sales.  So instead of holding him accountable, ByteDance rewarded Defendant Adjamian with a significant promotion and gave him even more power within the Company.

51. Empowered by the promotion, Defendant Adjamian began engaging in retaliatory acts against Ms. Matima.  For example, in late October 2022, Defendant Adjamian assigned Ms. Matima to be the sole BDR to attend a Diversity Equity and Inclusion in Technology conference, but he told her not to attempt to sell Lark software to any conference attendees and he also required her to suspend all of her other sales activities for two weeks to focus on the conference.  Defendant Adjamian's directives to Ms. Matima were blatantly and egregiously intended to sabotage her ability to meet her fourth quarter sales quota and, worse yet, Defendant Adjamian took Ms. Matima's list of leads that she had generated at the conference and he distributed them to the other (non-Black) BDRs, which increased their sales figures at her expense, despite the fact that she had cultivated those leads.

18

52. Additionally, Defendant Adjamian reassigned hundreds of low quality leads, steering them to Ms. Matima, from a non-Black BDR named Kimberly Collantes, who was struggling to generate leads and close sales associated with those low quality leads. Defendant Adjamian knew that assigning so many poor sales leads to Ms. Matima would prevent her from reaching her sales quota.  And in a call during November 2022, a non-Black BDR colleague, Kimberly Collantes, told Ms. Matima that she and Mr. Adjamian had agreed that her "junk leads" would be given to Ms. Matima to put Ms. Matima at a disadvantage.

53. In mid-November 2022, Defendant Adjamian refused to provide Ms. Matima with the quarterly bonus that she had rightfully earned as a result of her sales results.  Defendant Adjamian refused Ms. Matima's repeated requests for a meeting to discuss his failure to provide the bonus, refused to state when or if she would receive the bonus, or how it would be calculated.  Ultimately, Defendant Adjamian withheld this bonus, and the next quarterly bonus that Ms. Matima rightfully earned, while continuing to provide Ms. Matima's non-Black BDR colleagues with the timely payment of bonuses that they had earned.  Ms. Matima complained to Defendant Adjamian that he was unlawfully withholding her bonus and treating her differently because of her race.  In response, Defendant Adjamian reported Ms. Matima to ByteDance's human resources "business partner" Bhawna Raina, to whom Defendant Adjamian falsely claimed that others on his team had complained about her as an act of continuing retaliation.

19



54. Despite Defendant Adjamian's attempts to hinder Ms. Matima's sales performance, Ms. Matima was regularly the top performing BDR on her team when measured in terms of daily output.  And in late November, 2022, Defendant Adjamian acknowledged Ms. Matima's strong performance that he could no longer deny.  Defendant Adjamian  stated to Ms. Matima that she had been approved to transfer to another department, but that she would need to keep up her performance or else he would give a bad report about her to the hiring manager.  However, no such transfer materialized, and Ms. Matima remained under the supervision of Mr. Adjamian.

*Ms. Matima learns of Defendants' derogatory racial comments*

55. On January 5, 2023, a ByteDance account executive named Hannah Wells called Ms. Matima and informed her that Defendant Adjamian, Defendant Fayad, and three of Ms. Matima's BDR colleagues, Dana Azadegan, Kimberly Collantes, and Lisa Novichkova, had been routinely referring to Ms. Matima as "Black Snake" and that Defendant Adjamian had explained that "Black Snake" was the "spirit animal" that he associated

with Ms. Matima.  Ms. Wells stated that she learned this while attending a team dinner during a conference in Las Vegas.

56. The "Black Snake" appellation is not only obviously a racially derogatory term, but also suggests, by inference, that Ms. Matima has the negative qualities associated with a snake: deceit, untrustworthiness, and sneakiness.  It further suggests that she engaged in snake-like disloyalty by filing an internal ethics complaint about Defendant Adjamian's sexual harassment and racial bias against her.  These connotations negatively influenced the perception of Ms. Matima's colleagues about her performance.  For example, in early January 2023, one of ByteDance's account executives, Manuel "Manny" Perez, told Ms. Matima's teammates at a dinner that "All the BDRs are great, except one [Ms. Matima], she's checked out." It is ironic that Mr. Perez had such a negative view of Ms. Matima because just a few days prior, Ms. Matima had brought him in on a record-breaking, high revenue deal which she had developed and pre-closed on her own before engaging him and for which he received credit and a substantially high bonus for as the account executive, without actually doing any work, besides being present at the final client meeting in which the deal was closed. This attitude demonstrated by Mr. Perez speaks to the insidious nature of Ms. Matima's teammates and the hostile work environment she was constantly subjected to.

57. In addition, after Ms. Matima filed her charge with the U.S. Equal Opportunity Commission, she learned from Hannah Wells that Dana Azadegan, Kimberly Collantes, and their supervisors, Allen Adjamian and Ahmad Fayad, used the word "nigger" to describe Ms. Matima and Ms. Wells.  Ms. Wells learned this from Ms. Novichkova, a BDR who was leaving the Company and who related to Ms. Wells that Azadegan,

21

especially, was using that hateful term to refer to both Ms. Matima and Ms. Wells on a regular basis.

*Defendants continue to engage in retaliatory conduct*

58. Later in January 2023, Ms. Matima came down with the flu and told Defendant Fayad that she could not attend an in-person meeting being held in San Jose, California, due to her illness. Although Defendant Fayad personally approved Ms. Matima's request for sick leave, he pretended that she had not informed him that she would not attend the meeting. Instead, he ordered her to fly to San Jose that same night, threatening to report Ms. Matima to Human Resources if she did not comply. Ms. Matima was unable to follow Defendant Fayad's direction, due to illness, and instead attended the meeting virtually and actively participated in all group discussions, despite being ill. Defendant Fayad did in fact report Ms. Matima to Human Resources. As a result, Ms. Raina of Human Resources asked Ms. Matima why she had not attended the meeting in person, even though Ms. Raina knew that Ms. Matima had taken sick leave in the days leading up to and including the date of the meeting, and even though Ms. Raina attended the meeting and knew that Ms. Matima was there participating virtually. Mr. Fayad did not impose similar demands on Ms. Matima's non-Black BDR colleagues, or report them to Human Resources when those non-Black BDR colleagues came down with legitimate illnesses, as he did with Ms. Matima.

59. In another instance, Defendant Fayad berated Ms. Matima for missing work on a Friday in January 2023, even though Ms. Matima and two other salespeople had been told that they could take the day off. And in late January 2023, Ms. Matima learned that Defendant Fayad had taken leads that Ms. Matima had substantially developed and given

22

them to a white BDR named Lisa Novichkova. When Ms. Matima asked Ms. Novichkova about the leads, Ms. Matima was told that Defendant Fayad had promised Ms. Matima's leads to Ms. Novichkova and others. Ms. Matima then asked Defendant Fayad about the leads, and he refused to transfer them back to Ms. Matima. Moreover, Defendant Fayad and Defendant Adjamian told a teammate that Ms. Matima had "dropped the ball" by not contacting a potential client, for the purpose of smearing Ms. Matima's reputation among her colleagues. That allegation was false. In fact, Ms. Matima had contacted the client and Ms. Matima's work with that client instead led to one of the largest revenue-generating deals for the team. Despite this success, Ms. Matima never received any recognition for closing the deal.



60. In January 2023, Defendants Adjamian and Fayad began excluding her from meetings. She learned that there was a conference scheduled in New York City, where she lives. Every other member of her team had been invited except for her (including teammates who live in other cities and other countries). She was the only person who was going to

23

be excluded, until at the last minute, she received a request to attend only after one attendee cancelled.

61. In late January 2023, Defendant Fayad told Ms. Matima that he was aware she wanted to transfer to a different department, but that he would not let her do so.  He stated that Ms. Matima was "About to run into a lot of headwinds and I will tell you when I want you to transfer."  Then, while smirking, he stated: "Well, have you heard back from any hiring managers?  Is it even going anywhere?"  Then, Fayad stated "if a hiring manager contacted me, I wouldn't know what to tell them.  I wouldn't tell them good things about you."  Ms. Matima inferred from these comments that Defendant Fayad was actively interfering in her attempt to transfer to other departments within ByteDance.

62. On February 9, 2023, Ms. Matima learned that the head of marketing, Katrina Krantz, had wanted to hire her and was told by Defendant Fayed, by Andy Wang, and by Ms. Raina that she (Ms. Krantz) would not be permitted to hire Ms. Matima, despite Ms. Matima's stellar qualifications for the role.  And over the next two weeks, Defendant Fayad obstructed Ms. Matima's potential transfer to yet another department, first by delaying the submission of his approval of her transfer application, and later affirmatively stating that he would not approve the transfer request after all.



*Ms. Matima engages in additional protected activity*

63. On February 23, 2023, Ms. Matima filed a five-page internal complaint with ByteDance explaining that (1) her prior discrimination and hostile work environment complaints had been mishandled; (2) she had learned that Defendants Adjamian, Fayad, and others referred to her as "Black Snake"; (3) that Defendants Adjamian and Fayad had engaged in a pattern of retaliation against her for filing a prior complaint (and she provided supporting documents); (4) **she had sought to mitigate her damages by submitting twenty-one transfer applications to different departments to avoid Defendants Adjamian and Fayad, but Defendant Fayad and others had blocked her transfer**; and (5) that she continued to be treated in a discriminatory, retaliatory, and unprofessional manner.  She concluded her internal complaint by stating:

> At this point, because the hostility and retaliation are steadily escalating on a day to day basis, I do not at all feel safe.  I have experienced my direct leaders (Ahmad [Fayad], Allen [Adjamian]) smear my name, reputation and completely misrepresent facts and fabricate negative narratives regarding me.  I feel as if I am constantly walking on egg shells despite working very hard to advance Lark and continuing to be a high performing member of the team.  The aforementioned list of incidents outline continuing retaliation on the part of my direct leadership which ensued

after my previous Good Faith Ethics Complaint.  I hope that this time around, my pleas for help will be taken seriously as a I really hope to finally experience a healthy work environment, most preferably on a team, in role which is commensurate with my education, skills, and experience, in which I can thrive or at least be treated with basic respect and consideration.



26



64. This complaint led to another (inadequate) investigation from March 2023 to early June 2023, with which Ms. Matima fully cooperated.  But in the meantime, Defendant Fayad continued to engage in retaliatory conduct aimed at Ms. Matima.  For example, he scheduled a recurring two-hour weekly calling block after work hours on the East coast, which he knew would be burdensome for Ms. Matima to attend.  Defendant Fayad also told Ms. Matima that she should take Paid Time Off if she did not want to join an evening

27

meeting, and then he told other teammates that Ms. Matima refused to join the meetings

when she was unable to join some of them.  And once again, Defendant Fayad told Ms.

Matima to give her leads to white and non black BDR colleagues.





*Defendants retaliate against Ms. Matima because of her second complaint*

65. **On April 14, 2023, Mr. Wang, General Manager of Lark (North America), demanded to know if Ms. Matima was going to sue ByteDance, that the Legal Department was ready for litigation, and noted that Defendant Fayad had given Ms. Matima a negative performance evaluation. However, on a previous occasion, Mr. Wang had seemed sympathetic to Ms. Matima's plight by admitting that they (the company) had treated her badly and that he should not have promoted Mr. Adjamian. He further stated that if she decided to sue the company later, he would**

29

**testify on her behalf. This apparently remorseful behavior by this senior manager, is a clear admission of Bytedance's guilt**.  Up until that time, Ms. Matima received only positive performance feedback, including receiving an award for revenue generation.  Mr. Wang also suggested that he would create a new role for Ms. Matima that reported directly to him, but he did not follow through with transferring Ms. Matima into that role.

66. On April 18, 2023, Ms. Matima received the negative performance review described by Mr. Wang, which was completed by Defendants Fayad and Adjamian.  The overall score was "Improvement Needed."  However, the review contained false and unfair criticisms that did not accurately reflect Ms. Matima's strong performance and did not give sufficient weight to the fact that Ms. Matima had attained 95% of the sales goals her supervisors had established for her despite their attempts to interfere with her performance by compelling her to distribute her leads to white BDR colleagues.  The evaluation was presented by Defendant Fayed and Ms. Raina.  The negative review was the result of a material deviation, by ByteDance, from the normal review process.  Normally, that process involved employees selecting which other employees would be proving their performance feedback.  In Ms. Matima's case, she selected several colleagues who rated her performance as excellent.  However, in a departure from the Company's ordinary practice, Mr. Adjamian and Mr. Fayad then invited other colleagues to contribute to Ms. Matima's review for the purpose of lowering her overall performance appraisal.  When Ms. Matima made an objection to Mr. Wang concerning this departure from the Company's ordinary practice, **Mr. Wang informed Ms. Matima that she could appeal the evaluation and that he could correct it to reflect her actual performance**, but although she did appeal the review, **Mr. Wang and Ms. Raina later informed**

30

**Ms. Matima in late May 2023 that higher level leadership, including the Ethics Department, declined to approve any changes to the evaluation**. During the same meeting, Mr. Wang told Ms. Matima that if she decided to sue the company, he would ensure that her personnel file would contain negative information which would be provided to future employees when they contacted Bytedance as part of their background checks and  that Ms. Matima would effectively be black listed and prevented from being hired by other companies.



67. The negative performance review was completely unjustified because Ms. Matima had not only met, but exceeded her 2023 fourth quarter sales goals already- not even halfway through the quarter,  a direct contradiction to the negative performance feedback included

in her review.  The subjective portion of the review was contributed by coworkers who were invited by Fayad to contribute to Ms. Matima's review for the purpose of diminishing her rating, and those same coworkers, described above, who had been referring to Ms. Matima and Ms. Wells using the unambiguously racial epithet "nigger." Accordingly, the review was tainted with both racial and retaliatory animus and was contradicted by the available objective sales data.



68. In mid-May, 2023, Ms. Matima learned that Mr. Adjamian had been terminated from his employment by ByteDance.  This caused her to hope that ByteDance might actually take corrective action in response to her complaints.  Unfortunately, that wasn't to occur.

69. On June 1, 2023, ByteDance's Ethics Department investigators Christy Barr and Chelsea Walker informed Ms. Matima (in a documented meeting) that after investigating themselves, they were "unable to substantiate your [Ms. Matima]complaints against Mr. Adjamian and Mr. Fayad of gender discrimination (sexual harassment), race discrimination and national origin discrimination." They did not provide a copy of their

investigation report to Ms. Matima.  This conclusion was not revised upon the termination by the Company of Defendant Fayad's employment a few days later.

70. On June 5, 2023, Ms. Matima met with Bhawna Raina (Lark HRBP) at Ms. Raina's request. During that meeting, Ms. Raina proceeded to gaslight Ms. Matima  and make excuses for Ahmad Fayad's hostile, discriminatory, and retaliatory actions. She asked about confidential information regarding Ms. Matima's  Employee Relations complaint such as when she last met with Employee Relations, what they said, and for the specific names of the Employee Relations employees who spoke with Ms. Matima regarding her complaint. According to Bytedance's own policies, such questioning is a violation of confidentiality and improper.

71. Upon the termination of Defendant Fayad, Mr. Wang sought to use the vacant position to further his goal of terminating Ms. Matima's employment without providing her with further support for her sexual harassment, gender discrimination, race discrimination and retaliation claims, which he had previously indicated in April that he anticipated litigating.  First, Mr. Wang sought to promote the only other Black employee on the sales team into Defendant Fayad's vacant role, but that employee declined to take the position despite Mr. Wang's pressure to accept.  Next, Mr. Wang promoted his own bi-racial secretary, Christina Bowllan, who self-identifies as a Black female, and had zero sales or management experience, into the role.  Ms. Bowllan immediately reduced Ms. Matima's workload, and reassigned Ms. Matima's leads away to others.

33



### Ms. Matima submits her third (and final) internal complaint

72. On June 13, 2023, Ms. Matima sent a letter to Mr. Wang and other leaders, and to Human Resources, explaining that her civil rights had been violated due to discrimination and retaliation, and opposing those practices.  In response, Ms. Raina insulted Ms. Matima by stating that she (Ms. Matima) had failed to secure a new role, despite the fact that Ms. Raina had full knowledge of the fact that Defendants Adjamian and Fayad had sabotaged Ms. Matima's attempts to secure an internal transfer.

### ByteDance terminates Ms. Matima in response to her third internal complaint

73. On June 26, 2023, Ms. Matima was removed from her team's rotation for receiving new sales leads.

74. On July 3, 2023, Ms. Matima was excluded from the BDR Dashboard, which was used to assign leads, and Ms. Matima's leads were reassigned.  As a result, Ms. Matima was

effectively deprived of all job duties and responsibility, as well as of any means to generate the sales necessary to achieve her quarterly sales goals. **In order to mitigate her losses, she began to source her own leads. Despite having both her hands "tied behind her back", Ms. Matima continued to out perform the rest of her sales team.**





35



75. On August 11, 2023, Ms. Matima met with Mr. Wang and with Zoe Ma from Human Resources, who informed Ms. Matima that she was being terminated effective immediately.

76. **Mr. Wang and Ms. Ma articulated false and pretextual reasons (poor performance) for Ms. Matima's termination.  This was clearly false. Ms. Matima did meet her third quarter 2023 sales quota, and she also met 100% of her sales quota during the first quarter of 2023. In addition, Ms. Matima would go on to surpass her sales quota during the second quarter of 2023, attaining 108% of the quota. In addition to meeting her sales quotas, Ms. Matima's performance was exceptional in a particular way: as she was recognized on January 3, 2023 as the "Revenue Generator" of the entire Lark team. Ms. Matima had a conversion rate of 25%, which meant that 1 out of every 4 people she engaged became a paid customer. In stark contrast, the**

**national sales conversation rate is roughly 3% to 5%. Ms. Matima's peers had much**

**lower conversion rates than Ms. Matima.**



## First Quarter 2023



## Second Quarter 2023



77. Ms. Matima's termination took place less than two months after her June 13, 2023 internal complaint to Mr. Wang and other leaders, and to Human Resources, explaining that her civil rights had been violated due to discrimination and retaliation, and opposing those practices. And according to Mr. Fayad, the decision to terminate Ms. Matima was made earlier, less than *two weeks* after Ms. Matima's June 13, 2023 complaint. And only

one week prior to Ms. Matima's termination, she contacted the Company's Chief Executive Officer (Shou Chew) along with several other officials (Rubo Liang, David Xie, Nan Zhang, Xueling Manfred Shen, Ronnie Hua, Eliza Hu, Zoe Ma) and made another internal complaint.

78. Likewise, her negative performance evaluation was delivered on April 18, 2023 (and likely completed earlier), less than two months after Ms. Matima filed her internal complaint on February 23, 2023.  And after Ms. Matima's first complaint in August 2022 concerning Mr. Adjamian's sexual harassment, she began experiencing retaliatory acts from Mr. Adjamian and then Mr. Fayad that started within days and continued unabated for months.  The close temporal proximity between Ms. Matima's complaints of gender discrimination (sexual harassment) and race discrimination and the retaliation which ensued thereafter are clear indications of Bytedance's lawlessness.

79. Bytedance's devious and unlawful actions to cover up and undermine the law include using its Ethics, Employee Relations, and Human Resources personnel to issue false conclusions of purported investigations. Among the most senior personnel who engaged in this elicit and unethical behavior are: **Ashley Zangara**, an investigator for the Employee Relations Department,  **Lacey Rainwater**, an attorney and investigator for the Ethics Department, **Christy Barr**, an investigator for the Employee Relations Department, and **Bhwana Raina**, a Human Resources Business Partner. All of these personnel falsely claimed they had fully investigated Ms. Matima's, Katie Puris', Carolina Davis', Sheryl Sinclaire's, and Joël Carter's good faith complaints of sexual harassment, racial discrimination, gender discrimination, hostile work environment, and

39

unlawful retaliation and refused to provide copies of their investigation reports, in violation of their rights.

**MANY OTHER WOMEN HAVE BEEN SUBJECTED TO AND/OR OBSERVEVED <u>SEXUAL HARASSMENT/ MYSOGYNY AND HOSTILE WORK ENVIRONMENT AND RETALIATION </u>AT BYTEDANCE**

80. Ms. Matima is hardly the only victim of the Company's animus towards equality and safety of women. By way of example only:

☐ In February 2024, Katie Puris filed a major lawsuit against TikTok and Bytedance, alleging sexual harassment by a high ranking leader, gender/age discrimination, FMLA interference, and retaliation, including being fired for reporting a hostile work environment. **Lacey Rainwater, an attorney and investigator for the Ethics Department, covered up Ms. Puris' complaints as she did Ms. Matima's.**

☐ In October 2023, Hyeona Kim was subjected to retaliation after reporting sexual harassment/ gender discrimination by a high ranking leader. She feared for her safety and instead of protecting her, the company further endangered her by changing her role so that she would be directly reporting to the leader she had complained about.

☐ In September 2022, Shayna Stanley was retaliated against after reporting gender discrimination, personal appearance/ gender identity discrimination and family/ parental status by way for FMLA interference discrimination by her managers.

☐ In April 2021, Carolina Davis was retaliated against after reporting gender discrimination and a hostile work environment by her managers to human resources as well as the CEO. **Lacey Rainwater, an attorney and investigator for the Ethics Department, covered up Ms. Davis' complaints as she did Ms. Matima's.**

☐ In November 2021, Sheryl Sinclaire was retaliated against after reporting gender discrimination, racial discrimination and a hostile work environment by her manager. **Mina Yoon, an investigator for the Employee Relations Department, covered up Ms. Sinclaire's complaints just as she had Ms. Matima's.**

☐ In August 2023, Ro Wilson was retaliated against after reporting gender and racial discrimination by her manager. She subsequently filed an EEOC charge.

40

☐ In July 2023, Ashley Gates, a high ranking executive, leading an organization of 500 workers, was retaliated against after reporting gender and race discrimination. She subsequently filed an EEOC charge.

☐ In October 2023, Kimberely Oliveira, a high ranking executive, was retaliated against after reporting gender discrimination.

☐ In May 2023, Alexis Gallivan was retaliated against after reporting sexual harassment, gender discrimination and a hostile work environment.

☐ On December 12, 2023, during Hannah Wells' first offsite and training with Mr. Adjamian (VP of Sales and her direct supervisor), Mr. Adjamian announced to the room full of account executives, that "Minorities always want a discount…If me and my beautiful Nova Scotian wife are traveling and we are trying to get a good deal on something, who is going to have better luck getting a discount?" He then abruptly said- "No, Hannah! Me. I'm the 6'4" white guy. I'll get better discounts." Ms. Wells felt extremely uncomfortable because she was the only black person and the only female in the room. During a conference in Las Vegas, on January 1, 2023, Ms. Wells was called a racial slur regarding her "blackness" by a male co-worker, in a room in which she again was the only black female. She was embarrassed and humiliated. Ms. Wells was routinely subjected to misogyny and  disparate treatment by Mr. Adjamian while her non black, male co-workers were coddled and set up for success. She soon thereafter witnessed several co-workers, along with Mr. Adjamian and Mr. Fayad referring to Ms. Matima as a "Black Snake". And later learned from a co-worker that the same group routinely referred to Ms. Wells, Ms. Matima, and all other black people as "Niggers". Ms. Wells reported each and every incident to human resources and leadership  and was subjected to retaliation and pushed out of the company. Both Ms. Wells and Ms. Matima were part of the same Lark team and under the same leadership.

81.  Suffice it to say, Bytedance is a very bad and unsafe environment for women.

**MANY BLACK EMPLOYEES HAVE BEEN SUBJECTED TO AND/OR OBSERVED <u>RACIAL DISCRIMINATION, HOSTILE WORK ENVIRONMENT AND RETALIATION </u>AT BYTEDANCE**

82. Ms. Matima is hardly the only victim of the Company's animus towards equality and safety of all genders and identities and minorities. By way of example only:

☐ On September 21, 2023, Joël Carter filed an EEOC charge after having been retaliated against and wrongfully terminated when he complained of race discrimination, hostile

work environment and FMLA interference by his managers. Instead of investigating his complaints, **Lacey Rainwater, an attorney and investigator for the Ethics Department, Ashley Zangara, an investigator for the Employee Relations Department, and Christy Barr, an investigator for the Employee Relations Department all covered up his complaints as they did Ms. Matima's.** Mr. Carter's EEOC charge was filed jointly with Ms. Matima's as both were simultaneously represented by the same attorney. On January 8, 2025, much to his shock and horror, Mr. Carter inadvertently received an email thread exchange between his (and Ms. Matima's) attorney and opposing counsel discussing a payment exchange and their mutual intention to force both Mr. Carter's and Ms. Matima's cases into arbitration. Opposing counsel even offered a script (from his client) to Mr. Carter's and Ms. Matima's attorney which he would use to communicate to Mr. Carter in order to force them into arbitration. Even after leaving the company, Bytedance continues to interfere with and violate his rights.

☐ In September 2023, Hunter Boyle, a manager, was retaliated against after reporting a content ban on African Americans as well as other employees and leadership using animal slurs while referring to blacks.

☐ In April 2023, Ziyad Campbell was retaliated against and wrongfully terminated after reporting race discrimination and a hostile work environment.

☐ In June 2021, Udo Ahaghotu was retaliated against after reporting race discrimination and a hostile work environment.

☐ In November 2023, Jermaine Baldwin was retaliated against after reporting race discrimination and a hostile work environment.

☐ In June 2022, Austin Richard was retaliated against after reporting race discrimination and a hostile work environment.

☐ In 2022/2023, Montel Gest filed an EEOC charge after being retaliated against for reporting race discrimination and a hostile work environment.

83. Suffice it to say, Bytedance has an extremely toxic culture with pervasive racism, discrimination and  retaliation.



IV.    **CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

42

**Gender Discrimination (Hostile Work Environment and Quid Pro Quo Sexual Harassment) in violation of the New York State Human Rights Law, Executive Law §§ 209-301 *et seq***

**(Against Defendants Adjamian and ByteDance)**

84.    Plaintiff hereby repeats and realleges each and every allegation in the proceeding paragraphs as set forth fully herein.

85.    Defendant Adjamian's conduct constitutes disparate treatment gender discrimination in violation of the New York State Human Rights Law ("NYSHRL"), Executive Law §§ 209-301 *et seq*.

86.    Defendant Adjamian's unwelcome conduct of a sexual nature, including sexual advances, sexual comments, and the other conduct described above, including his attempts to gain access to her hotel room during business travel, created an intimidating, hostile, or offensive environment that affected the terms and conditions of Plaintiff's employment.

87.    Defendant Adjamian's conduct was because of Plaintiff's sex or gender.  Had Plaintiff not been female, Adjamian would not have engaged in such conduct.  And, upon information and belief, Adjamian has not and did not engage in such conduct with male employees.

88.    Defendant Adjamian's conduct, described above, was offensive, intimidating, and created an oppressive atmosphere, interfering with Plaintiff's work performance and changing the terms of her employment, including her continued employment, and her prospects for promotion.

89.    Defendant Adjamian's conduct constitutes a "continuing violation" of the New York State Human Rights Law rather than a discrete violation of the law.

43

90.     Defendant Adjamian's implicit threats that Plaintiff would have difficulty meeting her performance goals, described above, constitutes an act of intimidation intended to coerce her into being receptive toward his unwelcome sexual advances.

91.     Defendant Adjamian's conduct also constitutes *quid pro quo* sexual harassment in violation of the New York State Human Rights Law, because he conditioned Ms. Matima's continued employment and compensation upon her engaging in a sexual relationship with him. Defendant Adjamian's quid pro quo sexual overture threatened Plaintiff's continued employment, negatively impacted her ability to earn an income through commissions, and resulted in the restriction of Plaintiff's sales activities in connection with the DEI conference and reassignment of her sales leads, and culminated in a coercive demand for Plaintiff to enter into a sexual "arrangement" with Defendant Adjamian in return for him making her life so much easier if she gave him what he wanted.

92.     Defendant ByteDance is vicariously liable for Defendant Adjamian's conduct because, through Mr. Wang and Ms. Raina, Defendant ByteDance effectively condoned or approved of Defendant Adjamian's conduct, and that conduct eventually lead to tangible adverse employment actions against Plaintiff, including the withholding of her bonus, the restriction of her ability to earn income through generating sales commissions both directly as an instruction from Defendant Adjamian, and indirectly through the reassignment of Plaintiff's leads, and the refusal to allow Plaintiff to transfer positions internally, which culminated in the termination of her employment.

93.     Plaintiff's First Cause of Action makes this entire case subject to the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), which became effective March 3, 2022.

94.     As a result, Plaintiff suffered lost wages, emotional distress, reputational harm, and other damages recoverable under the NYSHRL.

## SECOND CAUSE OF ACTION

**Gender Discrimination (Hostile Work Environment and Quid Pro Quo Sexual Harassment) in violation of the New York City Human Rights Law, codified as Title 8 of the Administrative Code of the City of New York, § 8-107 *et. seq.***

**(Against Defendants Adjamian and ByteDance)**

95.     Plaintiff hereby repeats and realleges each and every allegation in the proceeding paragraphs as if set forth fully herein.

96.     Defendant Adjamian's conduct constitutes disparate treatment gender discrimination in violation of the New York City Human Rights Law ("NYCHRL"), codified as Title 8 of the Administrative Code of the City of New York, § 8-107 *et. seq*.

97.     Defendant Adjamian's conduct constitutes both hostile work environment sexual harassment and quid pro quo sexual harassment, as described in the First Cause of Action, above.

98.     Defendant Adjamian's conduct constitutes a "continuing violation" rather than a discrete act violation of the law.

99.     Defendant ByteDance is vicariously liable for Defendant Adjamian's conduct under the NYCHRL, which imposes strict liability upon employers for sexual harassment engaged in by supervisory employees, regardless of whether the employer has implemented policies, practices or procedures intended to prevent violations.

100.    Plaintiff's Second Cause of Action makes this entire case subject to the EFAA, which became effective March 3, 2022.

45

101.    As a result, Plaintiff suffered lost wages, emotional distress, reputational harm, and other damages recoverable under the NYCHRL.

## THIRD CAUSE OF ACTION
### Race Discrimination in Violation of NYSHRL
### (Against Defendants Fayad and ByteDance)

102.    Plaintiff hereby incorporates the allegations above.

103.    Plaintiff was and is a member of a protected class (Black).

104.    Plaintiff was qualified for her position, as demonstrated by the fact that Defendant ByteDance hired her, she received positive performance feedback, including a revenue generation award, and she achieved and maintained her sales quotas despite her leads being reassigned or diverted to other team members.

105.    Plaintiff suffered adverse employment actions including reduced sales commissions, withheld quarterly sales bonuses, she was denied internal promotions and transfers, her sales leads were reassigned and diverted to other team members, and she was ultimately terminated.

106.    The facts alleged above, including without limitation being called "Black Snake" by her supervisor Defendant Fayad, and her disparate treatment in the terms and conditions of her employment (including the reassignment and diversion of her sales leads to other (non-Black) coworkers, her being deprived of leads from the BDR dashboard that her other (non-Black) coworkers received, the deliberate provision of "junk leads" to Plaintiff and not to other (non-Black) coworkers, the assignment of a bi-racial (but purportedly Black) employee as a "Cat's Paw" to eliminate Plaintiff's job duties and responsibilities and consequently to deprive her of income earning opportunities and threatening her continued

46

employment all raise the inference that Defendants' conduct was motivated by discriminatory racial animus.

107.    Defendant ByteDance is vicariously liable for the conduct of Defendant Fayad because, through Mr. Wang and Ms. Raina, among others, Defendant knew or should have known of the unlawful conduct and failed to take action to prevent it.

108.    As a result, Plaintiff suffered lost wages, emotional distress, reputational harm, and other damages recoverable under the NYSHRL.

**FOURTH CAUSE OF ACTION**

**Race Discrimination in Violation of NYCHRL**

**(Against Defendants Fayad and ByteDance)**

109.    Plaintiff hereby incorporates the allegations above.

110.    Plaintiff was and is a member of a protected class (Black).

111.    Plaintiff was qualified for her position, as demonstrated by the fact that Defendant ByteDance hired her, she received positive performance feedback, including a revenue generation award, and she achieved and maintained her sales quotas despite her leads being reassigned or diverted to other team members.

112.    Plaintiff suffered adverse employment actions including reduced sales commissions, withheld quarterly sales bonuses, she was denied internal promotions and transfers, her sales leads were reassigned and diverted to other team members, and she was ultimately terminated.

113.    The facts alleged above, including without limitation being called "Black Snake" by her supervisor Defendant Fayad, and her disparate treatment in the terms and conditions

47

of her employment (including the reassignment and diversion of her sales leads to other (non-Black) coworkers, her being deprived of leads from the BDR dashboard that her other (non-Black) coworkers received, the deliberate provision of "junk leads" to Plaintiff and not to other (non-Black) coworkers, the assignment of a bi-racial (but purportedly Black) employee as a "Cat's Paw" to eliminate Plaintiff's job duties and responsibilities and consequently to deprive her of income earning opportunities and threatening her continued employment all raise the inference that Defendants' conduct was motivated by discriminatory racial animus.

114.    Defendant ByteDance is vicariously liable for Defendant Fayad's conduct under the NYCHRL, which imposes strict liability upon employers for race discrimination engaged in by supervisory employees, regardless of whether the employer has implemented policies, practices or procedures intended to prevent violations.

115.    As a result, Plaintiff suffered lost wages, emotional distress, reputational harm, and other damages recoverable under the NYCHRL.

**FIFTH CAUSE OF ACTION**

**Retaliation in Violation of NYSHRL**

**(Against Defendants Fayad and ByteDance)**

116.    Plaintiff reincorporates the allegations above.

117.    Plaintiff engaged in protected activity when she submitted each of her internal complaints, identified above, to Defendant ByteDance.

118.    After submitting her internal complaints, identified above, to Defendant ByteDance, Plaintiff suffered material adverse employment actions including, without limitation, reduced sales commissions, withheld quarterly sales bonuses, she was denied

48

internal promotions and transfers, her sales leads were reassigned and diverted to other team members, and she was ultimately terminated.

119.    As set forth above, the retaliatory acts experienced by Plaintiff took place within close temporal proximity to her engaging in protected activity, raising the presumption that her termination was because of her engaging in that protected activity.  This conclusion is buttressed by the fact that Defendant ByteDance articulated only pretextual reasons for Plaintiff's termination.

120.    Defendant ByteDance is vicariously liable for the conduct of Defendant Fayad because, through Mr. Wang and Ms. Raina, among others, Defendant knew or should have known of the unlawful conduct and failed to take action to prevent it.

121.    As a result, Plaintiff suffered lost wages, emotional distress, reputational harm, and other damages recoverable under the NYCHRL.

## SIXTH CAUSE OF ACTION
### Retaliation in Violation of NYCHRL
### (against Defendants Fayad and ByteDance)

122.    Plaintiff reincorporates the allegations above.

123.    Plaintiff engaged in protected activity when she submitted each of her internal complaints, identified above, to Defendant ByteDance.

124.    After submitting her internal complaints, identified above, to Defendant ByteDance, Plaintiff suffered material adverse employment actions including, without limitation, reduced sales commissions, withheld quarterly sales bonuses, she was denied internal promotions and transfers, her sales leads were reassigned and diverted to other team members, and she was ultimately terminated.

49

125.    As set forth above, the retaliatory acts experienced by Plaintiff took place within close temporal proximity to her engaging in protected activity, raising the presumption that her termination was because of her engaging in that protected activity.  This conclusion is buttressed by the fact that Defendant ByteDance articulated only pretextual reasons for Plaintiff's termination.

126.    Defendant ByteDance is vicariously liable for Defendant Fayad's conduct under the NYCHRL, which imposes strict liability upon employers for retaliation engaged in by supervisory employees, regardless of whether the employer has implemented policies, practices or procedures intended to prevent violations.

127.    As a result, Plaintiff suffered lost wages, emotional distress, reputational harm, and other damages recoverable under the NYCHRL.

### SEVENTH CAUSE OF ACTION

**Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964**

128.    Plaintiff reincorporates the allegations above.

129.    Plaintiff satisfies the administrative exhaustion requirements necessary to assert her Seventh Cause of Action.  On or about September 2023, Plaintiff filed an Administrative Charge with the United States Equal Employment Opportunity Commission ("EEOC") setting forth her allegations of Defendants' pattern and practice of race discrimination in employment.  On or about July 24, 2025, the EEOC issued a Notice of Right to Sue, and Plaintiff timely commenced this action by filing suit on or about October 10, 2025.

130.    Plaintiff was and is a member of a protected class (Black).

50

131.    Plaintiff was qualified for her position, as demonstrated by the fact that Defendant ByteDance hired her, she received positive performance feedback, including a revenue generation award, and she achieved and maintained her sales quotas despite her leads being reassigned or diverted to other team members.

132.    Plaintiff suffered adverse employment actions including reduced sales commissions, withheld quarterly sales bonuses, she was denied internal promotions and transfers, her sales leads were reassigned and diverted to other team members, and she was ultimately terminated.

133.    The facts alleged above, including without limitation being called "Black Snake" by her supervisor Defendant Fayad, and her disparate treatment in the terms and conditions of her employment (including the reassignment and diversion of her sales leads to other (non-Black) coworkers, her being deprived of leads from the BDR dashboard that her other (non-Black) coworkers received, the deliberate provision of "junk leads" to Plaintiff and not to other (non-Black) coworkers, the assignment of a bi-racial (but purportedly Black) employee as a "Cat's Paw" to eliminate Plaintiff's job duties and responsibilities and consequently to deprive her of income earning opportunities and threatening her continued employment all raise the inference that Defendants' conduct was motivated by discriminatory racial animus.

134.    Defendant ByteDance is vicariously liable for the conduct of Defendant Fayad because, through Mr. Wang and Ms. Raina, among others, Defendant knew or should have known of the unlawful conduct and failed to take action to prevent it.

51

135.   As a result, Plaintiff suffered lost wages, emotional distress, reputational harm, and other damages recoverable under Title VII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court grant the following relief:

a.   Plaintiff requests a trial by jury;

b.   An award to Plaintiff for her actual damages in an amount to be determined at trial for lost wages and benefits, health insurance premiums, and an award of back pay and front pay;

c.   An award to Plaintiff of compensatory damages in an amount to be determined at trial, BUT for the purpose of this matter, to be set at the minimum of the amount of $15M (Fifteen million U.S. dollars);

d.   An award of damages to Plaintiff for all non-monetary  and/or compensatory damages, including but not limited to emotional pain and suffering and emotional distress;

e.   An award of damages to Plaintiff, in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

f.   An award of prejudgment and post judgment interest;

g.   An award of punitive damages to deter future conduct by Defendant, in an amount to be determined at trial; BUT for the purpose of this matter, to be set at the minimum of the amount of $30M (Thirty million U.S. dollars);

h.   An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

i.   Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

Dated:   May 4th, 2026
         New York, New York

                                        /s/ Nnete Matima
                                        Nnete Matima, pro se

                                        nnetematima@gmail.com
                                        Tel: 914-222-3834

                                        cc:

                                        All parties of record (via email to Clerk of
                                        the Court)

# Exhibit C

**Subject:**      Plaintiff's ADDENDUM to Demand for Attorney Sanctions Filing: Matima v Bytedance, Inc. (d/b/a TikTok) Case No. 1:25-cv-10213-PAE

**Date:**         Tuesday, May 5, 2026 at 2:50:41 PM Eastern Daylight Time

**From:**         Nnete Matima

**To:**           Engelmayer NYSD Chambers

**CC:**           Nnete Matima

**Attachments:** Cover Letter for ADDENDUM to Demand for Atty Santions 05-05-26.pdf, Addendum to Demand for Atty Sanctions 05-05-26 (9).pdf

CAUTION - EXTERNAL:


Dear Clerk of the Court:

I write to submit into the record, my Addendum to my Demand for Attorney Sanctions and accompanying Cover Letter.

It is my intention to copy all parties of record.

Kindly ensure that all parties are copied. Thank you.

Respectfully Submitted,

Nnete Matima, pro se

nnetematima@gmail.com <mailto:nnetematima@gmail.com>
Tel: 914-222-3834
CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

Nnete Matima, *pro se*
nnetematima@gmail.com
Tel: 914-222-3834

May 5th, 2026

Clerk of the Court
United States District Court
Southern District of New York
40 Foley Square, Room 2201
New York, NY 10007
212-805-0268

Re: Matima v Bytedance, Inc. (d/b/a TikTok)
Case No. 1:25-cv-10213-PAE
Addendum to Demand for Attorney Sanctions

Dear Clerk of the Court:


Enclosed for filing, please find my Addendum to Demand for Attorney Sanctions in the above-referenced matter.

This demand is filed in response to the fraudulent instruments which defense counsel submitted to the court in their filing dated 4/27/26.

Thank you for your assistance.

Sincerely,

___/s/ *Nnete Matima*_____,*pro se*

Nnete Matima




cc:

All parties of record (via email to Clerk of the Court)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NNETE MATIMA,

    Plaintiff,

        -against-

ByteDance Inc., Allen Adjamian,
and Ahmad Fayad,

      Defendants.

Case No. 1:25-cv-10213-PAE

**ADDENDUM TO DEMAND  FOR**
**ATTORNEY SANCTIONS**

## RE: FALSIFIED EVIDENCE SUBMITTED BY DEFENDANTS ADJAMIAN AND FAYAD'S COUNSEL, IN VIOLATION OF FEDERAL RULES OF CIVIL PROCEDURE 11; 37(e)(2)(C) AND 18 U.S.C.§ 2320

Clerk of the Court
United States District Court
Southern District of New York
40 Foley Square, Room 2201
New York, NY 10007
212-805-0268

May 5, 2026

Dear Clerk of the Court:

I hereby urgently wish to add an addendum to my previously filed demand for attorney sanctions to further draw the court's attention to the unethical and criminal act of knowingly submitting a false instrument (Exhibits C, G, H, I) by Ivan R. Novich, Esq. of Littler Mendelsen, P.C.

**Obvious Discrepancies in Defendant's Exhibit C (Exhibit D):**

I wish to hereby add additional points to further point out discrepancies between the authentic screenshots and fraudulent instrument submitted to the court:

14. The series of Authentic Screenshots (Exhibits A&B) are <u>watermarked</u> for authenticity. If you zoom in to maximize the view, you will see a series of light gray writings ("Nnete Matima 8981") which signify  the employee's name  plus the last four digits of their phone number, superimposed into the text in a series of diagonal stripes. The fraudulent instrument lacks watermarks. (Exhibit C).

* Ironically, as you observe the screenshots included in my Second Amended Complaint, you will see at least two different changes in the four digit portion of my watermark to prove the fact that I had to keep changing my phone number due to stalking and constant hacking attempts by Defendants Adjamian, Fayad, and Bytedance.

15. In the series of Authentic Screenshots the participants' messages are differentiated by either a blue or grey background. (Exhibits A&B). The fraudulent instrument lacks that color- coded differentiation. (Exhibit C).

## Violation of Registered Trademark #866660218

By unlawfully acquiring my <u>trademarked</u> photo (Exhibit F) and misappropriating it, without my express written consent, to <u>knowingly</u> construct a false and fabricated instrument  (Exhibits C& D) and <u>working in concert (including aiding and abetting) to commit the criminal act </u>of defrauding this court: Demetra Makris, Todd H. Grishon, and Kevin W. Murray of Greenberg Traurig, Ivan Ross Novich of Littler Mendelsen attorney of record for Defendants Adjamian and Fayad, and Matthew L. Berman of Valli Kane &Vagnini, are all (individually) criminally liable and their respective law firms (corporations) are also vicariously liable.

## Criminal Liability under 18 U.S.C.§ 2320

1. **First-Time Offenders:** Individuals can face up to 10 years in federal prison and pay up to $2M in fines and up to $5M for corporations;

2. **Repeat/ Subsequent Offenders:** Penalties can double to 20 years in prison and pay up to $5M in fines for individuals, and up to $15M for corporations.

## Additional Legal Consequences:

1. **Restitution:** Courts often order offenders to pay full restitution to the trademark owner, covering lost profits and reputation damages;

2. **Civil Liability:** The trademark owner can file a separate civil lawsuit, which can lead to additional monetary damages, potentially up to $2M per mark in statutory damages if the infringement is deemed willful.

## State- Level Consequences:

- New York State treats trademark counterfeiting as a <u>felony</u> carrying up to 15 years in prison.

## Rule 11 Sanctions Pertaining to lawyers:

- Lawyers may be fined or ordered to pay opposing party's attorney fees if they file frivolous claims or defenses.

## Default Judgment under 37(e)(2)(C)

1. The court can issue a default judgment in favor of the plaintiff if the court finds that a defendant's attorney intentionally submitted falsified evidence in order to buttress a false and frivolous defense, effectively defrauding the court.

# Discussion:

The attorneys above deliberately, intentionally, outrageously and egregiously committed criminal actions by submitting false instruments to the court to not only defraud the court but also to file a frivolous Rule 11 claim against me (Plaintiff) as well as submit false evidence to assert a frivolous defense. Moreover, these attorneys worked in concert to launch an especially malicious smear campaign with the full intention to defame my character and reputation causing severe, permanent and irreparable harm to my <u>brand and reputation</u> and drive me into abject poverty. In other words, to totally and completely destroy me.

Littler Mendelsen, the self- proclaimed "union buster" law firm is well known for using underhanded tactics to terrorize and silence plaintiffs/ victims. Littler Mendelsen has a long-standing reputation for employing vile tactics such as exploiting legal loopholes to avoid reporting; intentionally delaying lawsuits to starve out plaintiffs, and using surveillance to intimidate plaintiffs- such as I was surveilled through my social media.

Moreover, my attorneys, Valli Kane and Vagnini, recklessly failed to exercise their duty of care to verify the false instrument's authenticity and intentionally relied upon Littler Mendelsen's

false instrument to establish a baseless justification to withdraw from this case, grossly violating our attorney-client relationship and their obligations to me (Plaintiff).

Lastly, Littler Medelsen worked in concert with all of the other attorneys involved in this case to engage in  egregious and heinous criminal acts and therefore must be punished to the fullest extent of the law. I urge the court to send a clear and resounding message that corruption will not be tolerated under any circumstances in the legal system.

## Demand for Sanctions pursuant to 18 U.S.C.§ 2320 and Rule 11

1.  I hereby move this court to apply the appropriate laws and rules cited on the caption above to sanction and punish all of these unethical attorneys to the full extent of the law, up to and including, disbarment, and criminal penalties pursuant to **18 U.S.C. § 2320** (up to ten years in prison, assuming they are all first-time offenders) and monetary sanctions pursuant to **Rule 11**.

2.  **Pursuant to 18 U.S.C. § 2320**, I move the court to award plaintiff monetary and punitive damages for each attorney's <u>willful, deliberate, intentional and malicious</u> conduct outlined as follows:

    a.  $2M in fines for each (individual) offender: Demetra Makris, Todd H. Grishon, and Kevin W. Murray of Greenberg Traurig <u>as well as their client </u>Bytedance; Ivan R. Novich of Littler Mendelsen <u>as well as his clients</u>, Defendants Adjamian and Fayad, and Matthew L. Berman and Sara Kane (who has worked on my case) of Valli Kane &Vagnini;

    b.  $5M in fines for each (corporation) offender: Littler Mendelsen P.C.; Greenberg Traurig, LLP; and Valli Kane & Vagnini, LLP as they are vicariously liable for their employees.

3.  **Pursuant to Rule 11**, I hereby move this court to apply the appropriate laws and rules cited on the caption above to sanction and punish all of these unethical attorneys <u>and their clients</u> (Adjamian, Fayad, and Bytedance) to the full extent of the law, up to and including, disbarment, and criminal and monetary penalties.

4.  Finally, I hereby move this court to render a **<u>Default Judgment</u>** in favor of Plaintiff pursuant to **Rule 37(e)(2)(C)** against Defendants Adjamian and Fayad and Bytedance and **immediately award me any and all compensatory, monetary, and punitive**

**damages as outlined in my Second Amended Complaint. It is abundantly clear as evidenced above that Defendants acted willfully, intentionally, and recklessly in bad faith and therefore a Default Judgment is not only appropriate but it is warranted.**

Respectfully Submitted,

___/s/ *Nnete Matima*_____,*pro se*

Nnete Matima

Dated: May 5, 2026

cc: All parties of record (via email to Clerk)